ACCEPTED
06-16-00032-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
9/12/2016 12:00:00 AM
DEBBIE AUTREY
CLERK

CASE NO. 06-16-00032-CV

_____

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
9/12/2016 9:29:00 AM
DEBBIE AUTREY
Clerk

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA

_____

KERRY BRYON NOBLE,

Appellant,

vs.

GAYLA RENEE LAWRENCE,

Appellee.

_____

On Appeal from the 62nd Judicial District Court
Franklin County, Texas
Cause No. 11,797
The Honorable Will Biard, Presiding

_____

# APPELLEE'S BRIEF

_____

Bird Old, III
State Bar No. 15244100
P.O. Box 448
Mt. Pleasant, Texas 75456
Telephone: (903) 572-4331
Telecopier: (903) 572-8831
birdoldiii@yahoo.com

Attorney for Appellee

## **Preamble**

Comes now Gayla Renee Lawrence, Appellee herein, who respectfully makes and files this, her Appellee's Brief.

The following conventions will be used to cite the record:

Reporter's Record                [volume] RR [page:line *or* exhibit number]

Clerk's Record:                CR [page]

Appellant's Brief:             A.Br. [page]

# **Table of Contents**

Preamble. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Response Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Standard of Review

      A.     Legal Sufficiency of the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     Factual Sufficiency of the Evidence.. . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument and Authorities

First Response Issue

      The evidence is legally and factually sufficient to support the award made for mental anguish damages, past and future.

      A.     Damages for Pain, Suffering and Mental Anguish Generally. . . . . . . 7

      B.     Fact Finder has Discretion in Making Award. . . . . . . . . . . . . . . . . . 9

      C.     Evidence Regarding Pain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.     Evidence Regarding Mental Anguish.. . . . . . . . . . . . . . . . . . . . . . . 14

E. Amount of Award is not Excessive. . . . . . . . . . . . . . . . . . . . . . . . 18

F. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Second Response Issue

The evidence is legally and factually sufficient to support the award made for disfigurement.

A. Disfigurement Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. Discretion in Awarding Disfigurement Damages. . . . . . . . . . . . . . 22

C. Evidence Supports Amount of Award for Disfigurement. . . . . . . . . 23

D. Noble Fails to Prove the Disfigurement Award is
  Objectionable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

  1. Existence of Disfigurement. . . . . . . . . . . . . . . . . . . . . . . . . 24

  2. Amount of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Third Response Issue

The evidence is legally and factually sufficient to support the award made for medical expenses incurred.

A. Connection Between Care Provided and Noble's Beatings. . . . . . . . 27

B. Amount of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fourth Response Issue

The evidence is legally and factually sufficient to show Noble gave Lawrence the Rolex watch she was awarded.

A. Gifts Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.      Presumption of Gift. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C.      Evidence Shows the Watch was a Gift.. . . . . . . . . . . . . . . . . . . . . . 32

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Certificate of Compliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Appendix

    Findings of Fact and Conclusions of Law. . . . . . . . . . . . . . . . . . . . . Tab 1

    Excerpts from trial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

    Selected Exhibits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 3

# Index of Authorities

Cases

Supreme Court

*Adams v. YMCA of San Antonio*, 265 S.W.3d 915 (Tex. 2008). . . . . . . . . . . . . . . 10

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bunton v. Bentley*, 153 S.W.3d 50 (Tex. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boyles v. Kerr*, 855 S.W.2d 593 (Tex. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . . . . . . . . . . 3

*Dow Chemical Co. v. Francis*, 46 S.W.3d 237 (Tex. 2001).. . . . . . . . . . . . . . . . . . 3

*Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788 (Tex. 2006). . . . . . . . . . . . . . . . 10, 17

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598 (Tex. 2004). . . . . . . . . . . . . . . . . . . 3

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757 (Tex. 2003).. . . . . . . . . 4, 9

*Goldman v. Torres*, 341 S.W.2d 154 (Tex. 1960). . . . . . . . . . . . . . . . . . . . . . . . 21

*Guevara v. Ferrer*, 247 S.W.3d 662 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gulf States Util. Co. v. Low*, 79 S.W.3d 561 (Tex. 2002). . . . . . . . . . . . . . . . . . . 9

*Haile v. Holtzclaw*, 414 S.W.2d 916 (Tex. 1967).. . . . . . . . . . . . . . . . . . . . . . . . 31

*Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61 (Tex. 1983). . . . . . . . . . . . . . . . . . . . 3

*Maritime Overseas Corp. v. Ellis*,
    971 S.W.2d 402 (Tex.), *cert. denied*, 525 U.S. 1017,
    119 S.Ct. 541 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Morgan v. Compugraphic Corp.*, 675 S.W.2d 729 (Tex. 1984).. . . . . . . . . . . . . . . 28

*Nelson v. Krusen*, 678 S.W.2d 918 (Tex. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex. 1995). . . . . . . . . . . . . . . . . 10, 11

*Saenz v. Fidelity & Guar. Ins. Underwriters*,
     925 S.W.2d 607 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 11, 20

*Texarkana Mem. Hosp., Inc. v. Murdock*, 946 S.W.2d 836 (Tex. 1998). . . . . . . . . 8

*Universal Life Ins. Co. v. Giles*, 950 S.W.2d 48 (Tex. 1997). . . . . . . . . . . . . . 17-18

*Wells v. Sansing*, 245 S.W.2d 964 (Tex. 1952). . . . . . . . . . . . . . . . . . . . . . . . . 31

Courts of Appeal

*Beaumont v. Basham*,
     205 S.W.3d 608 (Tex. App. — Waco 2006, pet. denied). . . . . . . . . . . . . . . 11

*Byrd v. Delasancha*,
     195 S.W.3d 834 (Tex. App. — Dallas 2006, no pet.). . . . . . . . . . . . . . . . . 28

*Country Roads, Inc. v. Witt*,
     737 S.W.2d 362 (Tex. App. — Houston [14th Dist.] 1987, no writ). . . . . . 12

*Dawson v. Briggs*,
     107 S.W.3d 739 (Tex. App. — Fort Worth 2003, no pet.). . . . . . . . . . . . 9, 29

*Diamond Offshore Svcs., Ltd. v. Williams*,
     01-13-01068-CV, 2015 WL 4480577 (Tex. App. — Houston [1st
     Dist.] July 21, 2015, pet. filed) (not yet released for publication). . . . . 21, 23

*Dollison v. Hayes*, 79 S.W.3d 246 (Tex. App. — Texarkana 2002, no pet.). . . . . . 8

*Dutton v. Dutton*,
     18 S.W.3d 849 (Tex. App. — Eastland 2000, pet. denied). . . . . . . . . . . . . 31

*Enright v. Goodman Distrib., Inc.*,
     330 S.W.3d 392 (Tex. App. — Houston [14th Dist.] 2010, no pet.). . . . . . 21

*Estate of LaValle*,
    218 S.W.3d 834 (Tex. App. — Beaumont 2007, pet. denied). . . . . . . . . . . 32

*Figueroa v. Davis*,
    318 S.W.3d 53 (Tex. App. — Houston [1st Dist.] 2010, no pet.). . . 9, 22, 25

*Finley v. P.G.*,
    428 S.W.3d 229 (Tex. App. — Houston [1st Dist.] 2014, no pet.). . . . . . . 9

*GAB Bus. Svcs., Inc. v. Moore*,
    829 S.W.2d 345 (Tex. App. — Texarkana 1992, no writ). . . . . . . . . . . . . 10

*General Motors Corp. v. Burry*,
    203 S.W.3d 514 (Tex. App. — Fort Worth 2006, pet. denied). . . . . . . . . 11

*Gomer v. Davis*,
    419 S.W.3d 470 (Tex. App. — Houston [1st Dist.] 2013, no pet.). . . . . . . 31

*Hopkins County Hosp. Dist. v. Allen*,
    760 S.W.2d 341 (Tex. App. — Texarkana 1988, no writ). . . . . . . . . . . 22, 23

*Landreth v. Reed*,
    570 S.W.2d 486 (Tex. Civ. App. — Texarkana 1978, no writ). . . . . . . . . 19

*Manning v. Golden*,
    12-12-00232-CV, 2014 WL 806326 (Tex. App. — Tyler Feb. 28,
    2014, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Marquette Transp. Co. Gulf — Inland, LLC v. Jackson*,
    01-10-01025-CV, 2012 WL 1454476 (Tex. App. — Houston [1st
    Dist.] Apr. 26, 2012, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . 21

*Martin v. Texas Dental Plans, Inc.*,
    948 S.W.2d 799 (Tex. App. — San Antonio 1997, writ denied). . . . . . . . 10

*Masterson v. Hogue*, 842 S.W.2d 696 (Tex. App. — Tyler 1992, no writ). . . . . . 32

*Molinari v. Palmer*,
    890 S.W2d 147 (Tex. App. — Texarkana 1994, no writ). . . . . . . . . . . . . . 31

viii

*Marriage of Moncey*,
  404 S.W.3d 701 (Tex. App. — Texarkana 2013, no pet.). . . . . . . . . . . . . 31

*Nipp v. Broumley*, 285 S.W.3d 552 (Tex. App. — Waco 2009, no pet.). . . . . . . . 31

*Northwest Mall, Inc. v. Lubri-lon Int'l, Inc.*,
  681 S.W.2d 797 (Tex. App. — Houston [14th Dist.] 1984,
  writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Panhandle Baptist Fnd., Inc. v. Clodfelter*,
  54 S.W.3d 66 (Tex. App. — Amarillo 2001, no pet.). . . . . . . . . . . . . . . 31

*Pedernales Elec. Co-op, Inc. v. Schulz*,
  583 S.W.2d 882 (Tex. Civ. App. — Waco 1979, writ ref'd n.r.e.). . . . . . . 22

*Pendergraft v. Carrillo*,
  273 S.W.3d 362 (Tex. App. — Eastland 2008, pet. denied). . . . . . . . . . . 25

*Pentes Designs, Inc. v. Perez*,
  840 S.W.2d 75 (Tex. App. — Corpus Christi 1992, writ denied). . . . . . . . 22

*Qualls v. Miller*,
  414 S.W.2d 746 (Tex. App. — Texarkana 1967, writ dis'd). . . . . . . . . . . 12

*Richardson v. Laney*,
  911 S.W.2d 489 (Tex. App. — Texarkana 1995, no writ). . . . . . . . . . . . . 32

*Roberts v. Roberts*,
  999 S.W.2d 424 (Tex. App. — El Paso 1999, no pet.).. . . . . . . . . . . . . . 31

*Royal Maccabees Life Ins. Co. v. James*,
  146 S.W.3d 340 (Tex. App. — Dallas 2004, pet. denied). . . . . . . . . . . . . 11

*Skiles v. Jack in the Box, Inc.*,
  170 S.W.3d 173 (Tex. App. — Dallas 2005, no pet.). . . . . . . . . . . . . . . 28

*Smith v. Carter*,
  13-11-00639-CV, 2012 WL 3252499 (Tex. App. — Corpus
  Christi Aug. 9, 2012, pet. denied) (mem. op.). . . . . . . . . . . . . . . 9, 22, 25, 26

*Somer v. Bogart*,
  749 S.W.2d 202 (Tex. App. — Dallas), *aff'd*, 762 S.W.2d 577
  (Tex. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Southwestern Bell Tel., L.P. v. Valadez*,
  02-07-00129-CV, 2008 WL 425746 (Tex. App. — Fort Worth
  Feb. 14, 2008, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Sunbridge Healthcare Corp. v. Penny*,
  160 S.W.3d 230 (Tex. App. — Texarkana 2005, no pet.). . . . . . . . . . .  8, 11,
  12, 21, 24

*Tagle v. Galvan*,
  155 S.W.3d 510 (Tex. App. — San Antonio 2004, no pet.). . . . . . . . . . . 10

*Telesis/Parkwood Retirement I, Ltd.*,
  462 S.W.3d 212 (Tex. App. — El Paso 2015, no pet.).. . . . . . . . . . . . 10, 11

*Tesfa v. Stewart*,
  135 S.W.3d 272 (Tex. App. — Fort Worth 2004, pet. denied). . . . . . . . . 22

*Texas Farmers Ins. Co. v. Cameron*,
  24 S.W.3d 386 (Tex. App. — Dallas 2000, pet. denied). . . . . . . . . . . . . 10

*Wal-Mart Stores, Inc. v. Tinsely*,
  998 S.W.2d 664 (Tex. App. — Texarkana 1999, pet. denied). . . . . . . . . . 23

*YMCA of San Antonio v. Adams*,
  220 S.W.3d 1 (Tex. App. — San Antonio 2006), *rev'd*, 265
  S.W.3d 915 (Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*York v. Boatman*,
  487 S.W.3d 635 (Tex. App. — Texarkana 2016, no pet.). . . . . . . . . . . . 32

Rules of Appellate Procedure

Tex. R. App. Pro. 9.4(i)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Tex. R. App. Pro. 9.5(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## Statement Regarding Oral Argument

Lawrence does not believe oral argument will assist the Court in deciding this case. The trial was not lengthy, the relevant law is well-settled and the arguments made are straightforward. All these are circumstances lending themselves to disposing of this case on the briefs.

## Response Issues Presented

### Response Issue One
(In Response to Issues One — Six)

The evidence is legally and factually sufficient to support the award made for mental anguish damages, past and future.

### Response Issue Two
(In Response to Issues Seven — Ten)

The evidence is legally and factually sufficient to support the award made for disfigurement.

### Response Issue Three
(In Response to Issue Eleven)

The evidence is legally and factually sufficient to support the award made for medical expenses incurred.

### Response Issue Four
(In Response to Issues Twelve — Thirteen)

The evidence is legally and factually sufficient to show Noble gave Lawrence the Rolex watch she was awarded.

1

## Summary of the Argument

Noble challenges the legal and factual sufficient of the evidence that his beatings of Lawrence caused her to suffer pain, mental anguish, disfigurement or even any medical bills, as well as the amounts of the award for the injuries he caused. These challenges are difficult, because he did not testify at trial and so the only evidence presented was favorable to Lawrence. As the Court would expect, this favorable evidence is more than enough to prove she suffered all of these injuries, as well as showing the things necessary to support the specific awards, such as the severity of her mental anguish and the permanence of her disfigurement.

Noble also challenges the trial court's determination that he gave Lawrence a watch while they were married. Again, the trial court's finding that this is the case is supported by ample evidence — if nothing else, by Lawrence's direct testimony that she received the watch as a gift.

The evidence supporting all the trial court's determinations, the judgment for Lawrence ought to be affirmed.

## Standard of Review

### A.    Legal Sufficiency of the Evidence

The evidence is legally insufficient to support the judgment if: (1) there is no evidence; (2) the law precludes consideration of the only evidence in the record; (3) the evidence amounts to no more than a scintilla; or (4) the evidence conclusively proves the opposite of what it must show. *City of Keller v. Wilson*, 168 S.W.3d 802, 810-11 (Tex. 2005). More than a scintilla of evidence exists if reasonable and fair-minded people can differ in their conclusions about its meaning, *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004), thereby allowing them to reach the same result as the trier of fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

### B.    Factual Sufficiency of the Evidence

Evidence is factually insufficient to support the judgment only if the judgment is so contrary to the overwhelming weight of the evidence as to make it clearly wrong or unjust. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In making this determination, reviewing courts consider all the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541 (1998). In making determinations about damages that can overlap (such as disfigurement, impairment and pain and suffering), the Court must consider the evidence unique to each category, and then all of the evidence relevant to all the

categories, and ask whether the evidence is factually sufficient to support the award made in the various overlapping categories. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 775 (Tex. 2003).

## Statement of Facts

Lawrence met Noble one day when she took her dog to be boarded. 2 RR 19:25-20:5. Noble worked in the same building, and soon asked Lawrence out on a date. 2 RR 20:5-8, 40:6-20.

Things started well enough, with the two spending time together during the day. 2 RR 41:3-4, 46:19-22. What Lawrence did not realize at the time was Noble was on parole and these dates violated Noble's parole; he had been sent to prison for trying to burn down a business he owned, but had been released to a halfway house and was supposed to be at work. 2 RR 46:21-47:14. Lawrence found out the truth when Noble's parole was revoked and he was sent back to prison for a number of months. 2 RR 47:15-50:15.

When Noble was released the couple got married, and went to Dallas for their honeymoon. 2 RR 50:23-51:10. It was that very night that the beatings started: Noble grabbed Lawrence by her hair as she slept, pulled her out of bed and threw her into the wall. 2 RR 52:5-10; *see also* 2 RR 50:16-22 (Noble had not committed any act of violence against Lawrence until after they were married). By way of explanation Noble faulted Lawrence for not trying to find him after he had gone downstairs. 2 RR 53:11-18.

Noble beat Lawrence savagely and frequently, eventually on nearly a daily basis. 2 RR 33:10-18. Because the severity of the beatings and the injuries they

5

caused is the primary issue on appeal Lawrence will address the details of these assaults below, but eventually they became so bad that she got a protective order against Noble and moved out. 3 RR R.Ex. 10. The parties both moved for divorce, with Lawrence also making a claim based on the assaults she had suffered. CR 4-5, 48-54.

The case was tried to the court on 2 March 2016. 1RR — 3 RR. The trial court granted the divorce on the grounds of cruelty and divided the property, CR 55-61, awarding Lawrence (among other things) a watch Noble had given her. CR 58. It also found for Lawrence on her assault claims, awarding her medical expenses, $200,000 for physical pain, suffering and mental anguish in the past, $25,000 for physical pain, suffering and mental anguish she would likely suffer in the future and $25,000 for disfigurement. CR 59, 81. It then entered Findings of Fact and Conclusions of Law in Support of the decree. CR 80-84.

From this disposition Noble appealed, CR 73-74, and has filed his Appellant's Brief, to which Lawrence now responds.

**Arguments and Authorities**

Response Issue One
(Restated)

The evidence is legally and factually sufficient to support the award made for mental anguish damages, past and future.

In no less than six separate issues, Noble argues the evidence is legally and factually insufficient to support the amount awarded to Lawrence for past and future mental anguish, pain and suffering, and that all these awards are excessive. Noble beat Lawrence, severely and repeatedly, but asks the Court to find his beatings did not cause Lawrence to suffer pain or mental anguish. The Court should decline his invitation.

A.     Damages for Pain, Suffering and Mental Anguish Generally

In order to understand why Noble's arguments are wrong, it is necessary to understand the law governing damage awards for pain, suffering and mental anguish.

"The basic rule of tort compensation is that the plaintiff is to be put in the position that he would have been in" in the absence of the defendant's bad act. *Nelson v. Krusen*, 678 S.W.2d 918, 924-25 (Tex. 1984). This requires compensating both "hard" damages, like medical bills or property damage, and "soft" damages, like pain, suffering and mental anguish. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

Unfortunately, the amount of pain and mental anguish a plaintiff has suffered or will suffer cannot be determined precisely, because there is no external yardstick against which such an award may be measured. *Texarkana Mem. Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1998) (recognizing a distinction between damages "readily capable of measurement by a certain standard," and those "more nebulous measures of damages, such as pain and suffering where the jury has broad discretion when fixing the amount of the award"); *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex. App. — Texarkana 2002, no pet.) ("The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss").

Because there is no "fixed rule" for measuring these kinds of damages, *Sunbridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 247 (Tex. App. — Texarkana 2005, no pet.), they cannot be calculated with "mathematical precision." *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). In turn, this means that once the existence of an injury that caused the victim to suffer physical pain or mental anguish is proven, the question of how much harm this injury has caused becomes a question of fact:

> The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. The process is not readily susceptible to objective analysis. The

8

presence or absence of pain, either physical or mental, is an inherently subjective question.

*Dawson v. Briggs*, 107 S.W.3d 739, 750-51 (Tex. App. — Fort Worth 2003, no pet.) (internal citations omitted); *accord, Smith v. Carter*, 13-11-00639-CV, 2012 WL 3252499 at * 2 (Tex. App. — Corpus Christi Aug. 9, 2012, pet. denied) (mem. op.); *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App. — Houston [1st Dist.] 2010, no pet.).

B.    Fact Finder has Discretion in Making Award

Because it is subjective, the determination of the proper amount to award for such damages is an issue particularly for the finder of fact, *Dawson*, 107 S.W.3d at 751; *and see, generally*, *Golden Eagle Archery,* 116 S.W.3d at 772 ("whether to award damages and how is uniquely within the factfinder's discretion"), although the award must provide "fair and reasonable compensation." *Finley v. P.G.*, 428 S.W.3d 229, 235 (Tex. App. — Houston [1st Dist.] 2014, no pet.). However, this does not mean a fact-finder's discretion to return an award for pain, suffering or mental anguish is unlimited.

Although there may be no yardstick by which such damages may be measured, this does not mean the damage award can be picked out of the air. Rather, the size of an award for pain, suffering or mental anguish must be based on the evidence. *Gulf States Util. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). This evidence can consist

9

of the injured person's own testimony about how she felt and about how the injuries she suffered have affected her life. *Telesis/Parkwood Retirement I, Ltd.*, 462 S.W.3d 212, 229 (Tex. App. — El Paso 2015, no pet.); *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App. — San Antonio 2004, no pet.).

With respect to damage awards for pain or mental anguish, the lack of a determinate yardstick against which such injuries are measured means the award must be appropriate in relation to the human experience of the fact finder. *Boyles v. Kerr*, 855 S.W.2d 593, 595 (Tex. 1993); *Texas Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 396 (Tex. App. — Dallas 2000, pet. denied); *Martin v. Texas Dental Plans, Inc.*, 948 S.W.2d 799, 805 (Tex. App. — San Antonio 1997, writ denied); *GAB Bus. Svcs., Inc. v. Moore*, 829 S.W.2d 345, 350 (Tex. App. — Texarkana 1992, no writ). The evidence is sufficient if it shows the "nature, duration, and severity" of the plaintiff's pain and anguish, and that as a result the victim suffered a "substantial disruption" of her daily routine. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995). This "substantiality" requirement means the damages must extend beyond "mere worry, anxiety, vexation, embarrassment." *Saenz*, 925 S.W.2d at 614.

Serious, visceral emotional reactions to trauma shows a person has suffered mental anguish damages, because such reactions are indicative of deeply-felt emotional trauma. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008).

10

So too do objectively less serious reactions to traumatic events, such as loss of sleep, non-clinical depression, mental disquiet and distress and suffering by one's family, if the disruptions these reactions cause are on-going and cause a substantial disruption of the plaintiff's routine. *See, e.g., Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004). The presence of physical symptoms such as depression, sleeplessness and illness also supports the conclusion that a victim has suffered compensable mental anguish. *See, e.g., Beaumont v. Basham*, 205 S.W.3d 608, 616 (Tex. App. — Waco 2006, pet. denied); *Tagle*, 155 S.W.3d at 520-21; *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 350-51 (Tex. App. — Dallas 2004, pet. denied). On the other hand, evidence that someone is merely "worried," *Saenz*, 925 S.W.2d at 615, or that he felt "hot" or found what the defendant did "upsetting," *Parkway Co.*, 901 S.W.2d at 445, is not sufficient to support an award for mental anguish.

C.    Evidence Regarding Pain

The Court would expect a person who was beaten by her husband every day would suffer a considerable amount of pain, and in fact would be justified in assuming this is so. Even in the absence of direct testimony or other evidence of pain, the trier of fact can use common sense and experience and infer the existence of pain or mental anguish from the existence of an injury liable to cause such suffering. *Telesis/Parkwood Retirement I*, 462 S.W.3d at 239; *General Motors Corp. v. Burry*, 203 S.W.3d 514, 552 (Tex. App. — Fort Worth 2006, pet. denied); *Sunbridge*

11

*Healthcare Corp.*, 160 S.W.3d at 248; *Qualls v. Miller*, 414 S.W.2d 746, 748 (Tex. App. — Texarkana 1967, writ dis'd). This general rule has been specifically applied in cases involving assaults. *Country Roads, Inc. v. Witt*, 737 S.W.2d 362, 365 (Tex. App. — Houston [14th Dist.] 1987, no writ) (presumption applied to show mental anguish is a natural consequence of being badly beaten before being ejected from a club). In fact, being the victim of an assault "is the classic type of event giving rise to presumed mental suffering." *YMCA of San Antonio v. Adams*, 220 S.W.3d 1, 7 (Tex. App. — San Antonio 2006) (Stone, J., dissenting), *rev'd*, 265 S.W.3d 915 (Tex. 2008). However, the Court need not rely on the presumption that Noble's beating caused Lawrence pain.

When she was asked whether she was in physical pain, Lawrence testified she "hurt every day" and "all the time." 2 RR 33:6-8, 74:19-24. That Lawrence was in pain is hardly surprising, given that Noble beat her daily. 2 RR 33:10-18.[1] Nor were his assaults the kind of minor contact that would qualify as an assault by offensive touching — they are full-scale beatings. 2 RR 63:13 (Lawrence described the beatings she endured as "just an a** whooping"); *accord*, 2 RR 52:11-53:10 (beating so bad they were thrown out of the hotel where they were honeymooning).

---

[1] Noble claims Lawrence only claims to have been assaulted twice. A.Br. at 13. This is false: although Lawrence's pleading only listed two specific dates, it made clear she was assaulted "at other times before and after ..." CR 51.

12

The vile nature of Noble's acts can be shown by a few concrete examples. As mentioned above, on their honeymoon Noble woke Lawrence from her sleep by jerking her out of bed by her hair and throwing her into the wall and across the room. 2 RR 52:4-10. On other occasions he would slam her body into the ground. 2 RR 109:5-7. Noble would pin Lawrence to the floor and stuff objects into her mouth, to stifle her screams and stop her from crying. 2 RR 62:24-63:9. He kicked her in the head, and tried to scald her. 2 RR 62:18-24. Noble left her with a black eye when he slammed her face into the dashboard of a car. 2 RR 81:6-25. He pulled her finger in an attempt to remove a ring Lawrence was wearing, threatening to break her finger to do so. 2 RR 63:9-11. Should more examples be necessary, Lawrence provided a litany of other examples in connection with her request for a protective order. 3 RR R.Ex. 10. This abuse continued for months, and Lawrence spent her mother's birthday at the police station, having her injuries photographed as evidence. 2 RR 63:14-23.

The foregoing is more than sufficient to show Lawrence suffered pain caused by Noble's physical assaults, and so an award for the pain and suffering inflicted on her is well-supported by the evidence. Noble's contrary argument, based on an analysis of the events on the dates of the two specific assaults mentioned in Lawrence's pleadings, A.Br. at 13-15, represents little more than an effort to whistle past the graveyard. None of the evidence detailed above is addressed, nor were any authorities cited that prove the evidence insufficient to support the award made.

D.    Evidence Regarding Mental Anguish

In addition to physical pain, Lawrence also suffered considerable mental pain supporting the trial court's award of mental anguish damages. Again, mental anguish damages can be presumed given the severity and frequency of the beatings Lawrence endured at Noble's hands, but again the Court need not presume because there is ample testimony supporting the award.

While awards of mental anguish cannot be based on mere minor annoyance or hurt feelings, they can be based on feelings that have a significant effect on the victim's life. Lawrence testified that because of the beatings she cannot sleep, catnapping on the couch at night for fear of Noble and the "goons" he has bragged about who she fears will come and take revenge on her. 2 RR 73:4-74:5. This fear is the product of direct threats Noble made against Lawrence, saying "I will bring you down," "you won't walk out of here" and "I will destroy you." 2 RR 75:7-12. Noble also threatened her life: "You won't walk out of here alive today. How many times did you tell me that?" 2 RR 75:12-13.

Lawrence has also suffered significant mental upset because of Noble's beatings. She cries all the time, even when alone — it "seems like all I ever do" — even though she is "not a cryer." 2 RR 74:14-18. She spent most of the summer before trial depressed, not functioning well. 2 RR 31:14-15. Previously a confident person, Lawrence now lacks confidence. 2 RR 74:10-12. Her self esteem has suffered,

14

2 RR 93:1-3, likely the product of Noble's "daily verbal abuse," where he told her she was "good for nothing" and everyone hates her. RR R.Ex. 10, attachment at 2, 3.

This has carried over to and interfered with Lawrence's work as a nurse. Lawrence was a nurse for many years before marrying Noble, who then forbid her to work. 2 RR 29:12-19, 70:17-20. Since being beaten by Noble Lawrence feels she can no longer work as a nurse, because nurses need confidence, judgment and the ability to relate to patients in stressful situations, characteristics Lawrence now lacks. 2 RR 71:12-72:6 (also saying she feels too "nervous" to work as a nurse). As a result she is training to be a freight broker, a job about which she knows little, except that it has been recommended to her. 2 RR 72:9-73:3.

Lawrence's inter-personal relationships have also suffered. She described feeling "disconnected" from other people, uncomfortable when around others and unable to communicate with them. 2 RR 74:5-10. She has tried to date but cannot, because she does not "feel normal anymore" and is unable to trust men. 2 RR 92:14-18. Instead, she plays Noble's beatings "in my head daily" like a "tape," "over and over." 2 RR 92:20-22. This affects her ability to be with others, because "nobody wants to be around somebody like that." 2 RR 92:22-23. Going further, Lawrence testified "I don't even want to be around me." 2 RR 92:25.

Others can seek solace in religion, but Lawrence cannot: "I don't even walk into my church anymore." 2 RR 92:11. She had been a regular worshiper, but Noble

ruined this by following her to church after she sought the protective order. 2 RR 93:11-14. Despite having lied about his own willingness to attend church to save their marriage, Noble all of a sudden found religion and began to attend Lawrence's church, sitting right in front of her, following her and trying to talk with her. 2 RR 93:14-25.

Noble was also controlling and manipulative, in large ways and small, serious and petty. He had forbidden Lawrence to work. 2 RR 29:12-19. He would forbid Lawrence to go to the bathroom, to shower, even to leave the room. 2 RR 98:19-24. When she was allowed to shower Noble timed her, dragging her out if he felt she took too long. 3 RR R.Ex. 10, attachment at 2. When he left, Noble would lock Lawrence in the house without a phone, her purse, money — even letting the air out of her tires, trapping her. 3 RR R.Ex. 10, attachment at 1. When angry he would give away Lawrence's clothes, which she has since seen being worn by other women around town. 2 RR 80:3-19. He would threaten to call CPS and have Lawrence's child taken away from her. 3 RR R.Ex. 10, attachment at 4. After injuring her, Noble would refuse to allow Lawrence to seek medical care. 3 RR R.Ex. 10, Affidavit § 11. Some of his acts seem almost insane — for example, he told Lawrence he had been putting meth in her coffee, so meth would be in her hair if she had to give a drug test. 3 RR R.Ex. 10, attachment at 4.

Finally, like many serial abusers, Noble would on occasion swear his love for Lawrence, swear he would do better, swear he would go to church, swear he would get counseling and shower her with gifts to convince her he had changed and not to leave, not to report his crimes to the authorities. 2 RR 11:2-6, 26:19-27:6, 55:21-56:4, 87:10-21. In fact he even went to counseling once, only to refuse to return after the counselor caught him beating Lawrence in the car after a session. 2 RR 56:17-57:17.

Since these events Lawrence sought counseling for her own feelings, but could not continue due to lack of money. 2 RR 34:4-7, 34:11-35:3. She knows she needs more counseling; how much, where it is going to come from and how she will pay for it, she does not know. 2 RR 24:5-9, 34:8-10.

In order to recover for mental anguish, Lawrence has to show a "substantial disruption" in her daily routine. *Fifth Club,* 196 S.W.3d at 797. Living in fear, having to change jobs and being subjected to what can only be called psychological torture along with the physical beatings certainly qualifies, especially in light of evidence showing the effect all of this has had on Lawrence. Her negative emotional reactions, depression, loss of sleep, mental disquiet and distress are all present, and all indicative of serious mental anguish.

The evidence detailed above is exactly the kind of "direct evidence of the nature, duration, and severity of the mental anguish" that Noble admits is sufficient to support such an award. A.Br. at 15 (*citing Universal Life Ins. Co. v. Giles*, 950

17

S.W.2d 48 (Tex. 1997)). In discussing the evidence, Noble dismissively ignoring the details of Lawrence's testimony. A.Br. at 16-20. This is perhaps understandable, given what the details show, but it means he fails to prove the award is unsupported by the evidence. For example, Noble observes Lawrence only saw a counselor twice, A.Br. at 17, but ignores why — she lacks the money to pay for the care she needs because Noble would not let her work and then beat her until she felt she had to leave the only job she has known. He notes she has "even dated some," *Id.*, but ignores that these dates led nowhere because of the after-effects of being beaten has on Lawrence's trust in men. He claims the evidence shows Lawrence's life "was not substantially disrupted," *Id.*, but makes no mention of any of the foregoing. Noble's partial analysis, ignoring negative evidence, does not prove his claims.

E.     Amount of Award is not Excessive

Nor has Noble show the decision of the court below ought to be reversed because the amount awarded for pain, suffering and mental anguish, past and present, is excessive, and therefore unsupported by the evidence.

In making this argument, much of what Noble says is just a re-warmed version of the arguments made above, that the evidence shows Lawrence's pain, suffering and mental anguish were just not severe enough to justify the damage award. A.Br. at 22-27, 32-35. Noble actually goes so far as to assert there is "little testimony concerning pain and suffering," A.Br. at 22, a claim that is: (1) followed by several pages of

18

discussion of the evidence of Lawrence's pain and suffering; and (2) belied by the testimony detailed above — the fact Noble does not want to discuss what Lawrence said does not mean there is "little testimony." Because the arguments are the same Lawrence makes the same response, that there is ample evidence showing she suffered considerable and ongoing physical pain and mental anguish, both in the past and that she will continue to suffer into the future.

Noble ends his argument with a list of cases where the trier of fact returned smaller damage awards than the trial court did in this case. A.Br. at 29-31. While comparisons between different cases may be something to consider in some circumstances, *Landreth v. Reed*, 570 S.W.2d 486, 490 (Tex. Civ. App. — Texarkana 1978, no writ), a necessary first step is to show the other cases are similar enough to make a valid comparison, something Noble fails to do. Instead, he offers a bare-bones list of car wreck cases, most of them district court judgments not reported anywhere Lawrence can find, and all of which are unsupported by any analysis of the facts to prove they resemble the injuries Lawrence suffered.

Specifically, none of the authorities Noble cites involve being repeatedly assaulted by one's husband, and none of them are discussed in anything like enough detail to allow them to be meaningfully compared to this case. The only reported case Noble cites involves a car accident that: (1) required a seven day hospital stay, not ongoing abuse that continued for months on end and continues to have effects even

19

after it has ended; and (2) was ultimately decided based on the determination that the jury acted within its broad discretion in making the damage award, discretion Noble asks the Court to deny the trial court here. *Manning v. Golden*, 12-12-00232-CV, 2014 WL 806326 at * 5-6 (Tex. App. — Tyler Feb. 28, 2014, no pet.) (mem. op.).

The fact an unnamed plaintiff recovered $457 in damages in an auto accident case tried in Dallas County does nothing to prove Lawrence cannot recover the amounts awarded to her. Perhaps the $457 award is proper. Perhaps it is not. Perhaps it is within the scope of the jury's discretion. In any event, it does nothing to aid the Court in deciding th is case. The standard of review requires Noble to either prove that there is no evidence supporting an award for mental anguish at all (legal sufficiency) or that what evidence there is so overwhelmingly outweighed by contrary evidence (factual sufficiency). Noble's perfunctory comparisons between this case and dissimilar ones does not carry this burden.

F.     Conclusion

The suffering Lawrence underwent at the hands of Noble goes far beyond "mere worry, anxiety, vexation, embarrassment," *Saenz*, 925 S.W.2d at 614, and shows both the necessary severity of pain and anguish and disruption of Lawrence's life to support the damage award. The evidence presented is legally and factually sufficient to support the trial court's award for suffering and anguish (past and future) in the amount of the judgment. The judgment ought to be affirmed.

The evidence is legally and factually sufficient to support the award made for disfigurement.

Noble's next complaint is about the trial court's award of $25,000 for the disfigurement Noble caused Lawrence. As was the case with damages for mental anguish and pain and suffering, Noble argues both that the award of disfigurement damages is unsupported by the evidence, and that the amount awarded is excessive.

A.    Disfigurement Damages

Noble's assaults on Lawrence have left her scarred, and there is no question that a person who is scarred has been disfigured. "Disfigurement" is defined as any injury that "impairs or injures beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner." *Sunbridge Healthcare Corp.*, 160 S.W.3d at 252 (*citing Goldman v. Torres*, 341 S.W.2d 154 (Tex. 1960)); *accord, Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 402 (Tex. App. — Houston [14th Dist.] 2010, no pet.). Disfigurement certainly includes scars, *Diamond Offshore Svcs., Ltd. v. Williams*, 01-13-01068-CV, 2015 WL 4480577 at * 11 (Tex. App. — Houston [1st Dist.] July 21, 2015, pet. filed) (not yet released for publication); *Marquette Transp. Co. Gulf — Inland, LLC v. Jackson*, 01-10-01025-CV, 2012 WL 1454476 at * 14 (Tex. App. — Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.), the existence and particulars of which may be shown

21

through medical records, photographs or by allowing the trier of fact to se the scar. *See, e.g., Tesfa v. Stewart*, 135 S.W.3d 272, 276-77 (Tex. App. — Fort Worth 2004, pet. denied); *Pedernales Elec. Co-op, Inc. v. Schulz*, 583 S.W.2d 882, 886 (Tex. Civ. App. — Waco 1979, writ ref'd n.r.e.).

B.      Discretion in Awarding Disfigurement Damages

Like other kinds of "soft" damages, there is no yardstick for measuring such damages, meaning the finder of fact has great discretion to award damages for disfigurement. *Smith* at * 2; *Figueroa*, 318 S.W.3d at 64. Relatively large damage awards have been upheld for examples of disfigurement that seem to be both less serious and more readily reparable than the scars Noble inflicted on Lawrence. *See, e.g., Pentes Designs, Inc. v. Perez*, 840 S.W.2d 75, 81 (Tex. App. — Corpus Christi 1992, writ denied) (affirming $500,000 disfigurement award for loss of two teeth).

As with pain, suffering and mental anguish this discretion is not boundless, but is based on many different kinds of evidence and consideration. The size, severity, appearance and placement of the scar are logically all factors to consider. Evidence that a victim finds a scar disfiguring, and is ashamed of or embarrassed by it, also supports a disfigurement award. *See, e.g., Hopkins County Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App. — Texarkana 1988, no writ); *Northwest Mall, Inc. v. Lubri-lon Int'l, Inc.*, 681 S.W.2d 797, 804 (Tex. App. — Houston [14th Dist.] 1984, writ ref'd n.r.e.). The fact a scar might not be visible does not mean it does not qualify

22

as disfiguring, or is not compensable. *Diamond Offshore Svcs*. at * 11; *Wal-Mart Stores, Inc. v. Tinsely*, 998 S.W.2d 664, 673 (Tex. App. — Texarkana 1999, pet. denied). Finally, the fact a scar is not getting any worse also does not mean an award for future disfigurement is unavailable; the embarrassment the scar will cause in the future is also compensable. *Hopkins County Hosp. Dist*., 760 S.W.2d at 344.

C.      Evidence Supports Amount of Award for Disfigurement

Lawrence's testimony shows she bears a number of scars caused by Noble's abuse. She has scars on both of her arms, which she pointed out to the trial court. 2 RR 65:4-66:1; 3 RR R.Ex. 4, 14. She has a scar on her right shin. 2 RR 66:9-14; 3 RR R.Ex. 4. She has a scar right between her eyes, caused when Noble "hit me with a metal wall hanging." 2 RR 68:14-69:3; 3 RR R.Ex. 5, 15. Lawrence testified she is embarrassed by her scars, 2 RR 78:2-4, permanent reminders of Noble's abuse. These scars will stay with her for the foreseeable future, because she has no money for plastic surgery to remove them. 2 RR 78:17-24. This evidence is more than enough to support the disfigurement award Lawrence received because she was scarred by Noble.

D.      Noble Fails to Prove the Disfigurement Award is Objectionable

Noble permanently scarred Lawrence in the middle of her face by hitting her with a piece of metal. He left other scars on her body (and her psyche) through his abuse. Despite this, Noble dismisses these injuries as "minimal," A.Br. at 39, and

23

claims the evidence does not support the amount awarded for Lawrence's disfigurement. A.Br. 41. Noble is wrong, and the proof he is wrong is found in the authority he cites.

1.     Existence of Disfigurement

Beginning with the severity of Lawrence's injuries and the sufficiency of the evidence supporting any award, Noble's argument is based on his self-interested perception that Lawrence's scars do not impair her appearance. *Id.* Lawrence begins by observing that this argument — "She does not look disfigured to me, so anyone who thinks otherwise is ignoring the evidence" — is more than a little insulting.

She goes on to note that she (and the trial court) also disagree with Noble's dismissal of the permanent injuries he caused, but that in any case the definition of impairment is broader than Noble asks the Court believe. Anything that "impair or injures beauty, symmetry, or appearance," or which makes some part of a person unsightly, misshapen, imperfect or deformed qualifies as disfigurement. *Sunbridge Healthcare Corp.*, 160 S.W.3d at 252. As set forth above, scars (even those that are not visible) meet this definition; their very presence mars the person who has been scarred. Noble does not discuss these authorities, and so does nothing to distinguish them or to explain why Lawrence's scars are unworthy of consideration.

Noble also focuses on the fact the bruises he gave Lawrence have healed, *Id.* at 40-41, which may be true but does nothing to prove the trial court's conclusion that

24

Lawrence is disfigured and that Noble did it is supported by insufficient evidence. That some injuries which were once disfiguring have healed does not prove other injuries that have not healed are not disfiguring. This conclusion is supported by the only authority Noble cites, which says evidence showing the plaintiff had suffered a "2.5 centimeter laceration under his lip" did not prove he was disfigured. *Pendergraft v. Carrillo*, 273 S.W.3d 362, 367 (Tex. App. — Eastland 2008, pet. denied). The court reached this conclusion because it found there was no evidence that this cut caused "any scarring or other type of disfigurement ..." *Pendergraft*, 273 S.W.3d at 367-68. While cuts and bruises that have healed may not support an award for disfigurement, permanent scars do.

2.    Amount of Award

In support of his claim that the award for disfigurement is excessive, Noble cites *Figueroa* for the proposition that $10,000 was enough in a case where the victim lost several teeth, and *Smith* for the proposition that $5,000 was enough for a scar on the victim's forehead. *Id.*

*Figueroa* does say as much, but the reason it came out the way they did shows Noble's argument is wrong. In *Figueroa*, the appellate court affirmed the disfigurement award because it was the amount awarded by the trier of fact, and the jury had broad discretion to make the award. *Figueroa*, 318 S.W.3d at 62-64. Just as the award in *Figueroa* was affirmed because it was within the jury's discretion, the

award to Lawrence should be affirmed because it is within the trial court's discretion. Noble complains the award of disfigurement damages was "intended to punish" him, A.Br. 41, but offers no evidence to support this self-interested claim.

*Smith* is even less helpful to Noble than *Figueroa*. The court in *Smith* did award $5,000 for past disfigurement; it also awarded another $5,000 for future disfigurement, *Smith* at * 1, something Noble fails to mention. The defendant then appealed the sufficiency of the evidence supporting the award of mental anguish damages but not the sufficiency of the evidence supporting disfigurement awards, *Id.*, so they were not then addressed on appeal. Had they been addressed, the appellate court would have presumably done exactly what it did with the complaints about the sufficiency of the mental anguish evidence — find the award was within the discretion of the fact-finder, and affirm the judgment. *Id.* at 4-5.

As trier of fact, the trial court has discretion to make an award for the disfigurement Lawrence suffered. It heard evidence that Noble is responsible for scarring Lawrence, including a scar right between her eyes. The trial court found $25,000 was adequate compensation for these injuries, a determination well within its discretion. Noble fails to prove no damages occurred or that the damage award is excessive, and so is not entitled to have this portion of the trial court's judgment set aside.

The evidence is legally and factually sufficient to support the award made for medical expenses incurred.

In his next argument Noble assails the $600 Lawrence was awarded for medical expenses she incurred because of his beatings, claiming this amount is unsupported by the evidence and is too high. Once again the evidence belies his argument.

## A.     Connection Between Care Provided and Noble's Beatings

Noble's argument that no award for medical expenses is proper is based on the assertion that no expert testified that her injuries were the product of the savage beatings he administered. Rather, he speculates that perhaps her injuries were caused by something else, such as "repetitive activity, such as a nurse would perform." A.Br. at 43. There are two discrete problems with this argument.

The first is there *is* expert testimony connecting Noble's assaults and Lawrence's injuries. It came from Dr. Tim Davis, who treated Lawrence. 2 RR 107:20-108:16. When Lawrence visited Dr. Davis, she told him her injuries were caused by Noble's beatings: a neck injury from being slammed into the dashboard and a hip injury from being slammed into the ground. 2 RR 109:2-10. Dr. Davis examined her, and found evidence she was injured, 2 RR 110:4-12, and concluded her injuries were the product of "some type of trauma." 2 RR 111:17-23. Noble's suggestion notwithstanding, there is nothing proving Lawrence's injuries were related

to her work as a nurse.[2] In any case, Noble ignores that the evidence shows he had forbidden Lawrence to work, 2 RR 29:12-13, 69:13-70:3, and exactly how Lawrence could be injured on the job she was not doing rather than from Noble's daily beatings, goes unexplained.

However, even without Dr. Davis's testimony, there is ample evidence connecting the treatment of Lawrence's injuries to Noble. The connection between a person's injuries and their cause can be shown by lay testimony if the evidence allows a person to use common sense to link the act and the injury. *Southwestern Bell Tel., L.P. v. Valadez*, 02-07-00129-CV, 2008 WL 425746 at * 3 (Tex. App. — Fort Worth Feb. 14, 2008, no pet.) (mem. op.); *Byrd v. Delasancha*, 195 S.W.3d 834, 837 (Tex. App. — Dallas 2006, no pet.). This happens when the lay testimony establishes a sequence of events providing a "strong, logically traceable connection between the event and the condition" complained of. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984); *Byrd*, 195 S.W.3d at 837; *Skiles v. Jack in the Box, Inc.*, 170 S.W.3d 173, 184 (Tex. App. — Dallas 2005, no pet.). An example of such evidence is where the plaintiff shows he was healthy immediately before an event, but

---

[2] The idea seems to have come from testimony of Dr. Davis, who said the presence of scars is usually indicative of trauma, but not necessarily, and can sometimes be the product of "repetitive stress or something of that nature ..." 2 RR 112:1-5. Given the placement of Lawrence's scars, her testimony about how they got there and the lack of evidence connecting her work as a nurse to any kind of repetitive injury, the idea that her scars are the product of working as a nurse rather than Noble's beatings is unsupportable.

after the event suffers from an injury. *See, e.g., Valadez* at \* 3 (victim testified he fell in hole, his shoulder started to hurt and he went to the hospital, which diagnosed him with a torn rotator cuff; evidence sufficient to connect fall and injury); *Dawson*, 107 S.W.3d at 753-54 (evidence showed victim sought treatment for jaw immediately after collision, and records showed injury occurred in collision is sufficient to establish causation). Even the sole authority Noble cites recognizes this is the case. According to the Supreme Court, lay testimony can connect an act and an injury when "the general experience and common sense of laypersons are sufficient to evaluate the condition and whether they were probably caused by the occurrence." *Guevara v. Ferrer*, 247 S.W.3d 662, 668-69 (Tex. 2007).

Here, Lawrence testified she went to see Dr. Davis because Noble was hitting her "daily," and as a result she hurt "all the time." 2 RR 33:6-11. She told Dr. Davis the particular injuries she was complaining about were the product of having her face slammed into the dashboard and being picked up and slammed to the ground by Noble. 2 RR 81:23-25, 83:19-24, 109:4-7. The trial court, applying its common sense, could find that being slammed into the dashboard of a car, into the ground and being punched, kicked and beaten could cause Lawrence's injuries. Lawrence does not need a medical expert to prove to the trial court that being punched by one's husband can lead to injury.

## B.    Amount of Award

Noble also claims the evidence supports an award of only $407 for medical expenses incurred, rather than for the $600 awarded. A.Br. at 43. Once again Noble's argument is based on cherry-picked evidence that ignores the standard of review. While there is some evidence that Dr. Davis was paid $407, there is also evidence Lawrence's medical bills total the $600 awarded by the trial court, an amount including Dr. Davis's bills. 2 RR 32:14-21. Noble also ignores that Lawrence saw other health care providers, seeking the assistance of a mental health counselor who she saw several times but whom she had to quit seeing for lack of funds. 2 RR 34:8-23. The trial court's judgment is directly supported by the testimony it heard, and so its judgment is supported by legally and factually sufficient evidence.

### Response Issue Four
#### (Restated)

The evidence is legally and factually sufficient to show Noble gave Lawrence the Rolex watch she was awarded.

Finally, in the division of property the trial court awarded Lawrence a Rolex watch, CR 58, finding it had been given to her by Noble. CR 82. Noble once again claims the evidence is legally and factually insufficient to prove this. Noble is once again wrong.

A.     <u>Gifts Generally</u>

A "gift" is a voluntary of transfer of property made gratuitously and without consideration. *Gomer v. Davis*, 419 S.W.3d 470, 476 (Tex. App. — Houston [1st Dist.] 2013, no pet.); *Nipp v. Broumley*, 285 S.W.3d 552, 558 (Tex. App. — Waco 2009, no pet.); *Panhandle Baptist Fnd., Inc. v. Clodfelter*, 54 S.W.3d 66, 72 (Tex. App. — Amarillo 2001, no pet.). In fact, lack of consideration by the donee is the "essential characteristic of a gift." *Panhandle Baptist Fnd.*, 54 S.W.3d at 72; *accord, Molinari v. Palmer*, 890 S.W2d 147, 149 (Tex. App. — Texarkana 1994, no writ).

The three legal elements of a gift are: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Gomer*, 419 S.W.3d ay 476; *Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App. — El Paso 1999, no pet.). Whether the donor had the intent to make a gift is determined at the time the gift was made, *Marriage of Moncey*, 404 S.W.3d 701, 710 (Tex. App. — Texarkana 2013, no pet.); *Nipp*, 285 S.W.3d at 558; *Dutton v. Dutton*, 18 S.W.3d 849, 854 (Tex. App. — Eastland 2000, pet. denied), not at a later date, when he might have occasion to "reconsider" his intentions. In determining if a transfer is a gift, courts consider the facts and circumstances surrounding the transaction, *Haile v. Holtzclaw*, 414 S.W.2d 916, 927 (Tex. 1967), and a gift is shown when the donor intends for title to the corpus of the gift to vest in the donee unconditionally. *Wells v. Sansing*, 245 S.W.2d 964, 965 (Tex. 1952).

31

## B.   Presumption of Gift

In his brief, Noble claims that it is Lawrence's duty to prove the existence of a gift by clear and convincing evidence. A.Br. at 44-45. This is not correct: in fact, the law is the reverse. When property is gratuitously transferred to a "natural object" of the "bounty" of the donor, i.e., a spouse, child or other close family member, the law presumes the transfer was a gift. *Somer v. Bogart*, 749 S.W.2d 202, 204 (Tex. App. — Dallas), *aff'd*, 762 S.W.2d 577 (Tex. 1988); *accord, York v. Boatman*, 487 S.W.3d 635, 642 (Tex. App. — Texarkana 2016, no pet.); *Richardson v. Laney*, 911 S.W.2d 489, 492 (Tex. App. — Texarkana 1995, no writ). When this presumption applies the party *opposing* the finding of gift, i.e., Noble, must overcome it with clear and convincing evidence at trial. *York*, 487 S.W.3d at 642; *Estate of LaValle*, 218 S.W.3d 834, 836 (Tex. App. — Beaumont 2007, pet. denied); *Masterson v. Hogue*, 842 S.W.2d 696, 697 (Tex. App. — Tyler 1992, no writ).

## C.   Evidence Shows the Watch was a Gift

Because Lawrence and Noble were married when he gave her the watch, Noble is obligated to present clear and convincing evidence proving he did not give the watch to Lawrence, a burden he failed to carry. He failed to carry the burden because there is ample evidence that he gave the Rolex to Lawrence, and he offered no contrary evidence.

32

First, Lawrence clearly testified that Noble gave her the watch:

Q:     Did you have in your possession a Rolex watch?

A:     Yes, I did.

Q:     And how had you come in possession of that watch?

A:     He [Noble] gave it to me.

2 RR 87:10-14; *accord*, 2 RR 90:13-16, 101:19-20.

Lawrence then offered an explanation of why Noble would do such a thing —

it was another of his efforts to buy her loyalty with property, after having beaten her.

2 RR 87:15-24.Nothing in the record proves or even hints that Lawrence paid for the

watch, or that there was any consideration for the transfer. This alone shows Noble

intended to make a gift of the watch, an intent he held at the moment he delivered it

to her. In fact, given Noble's violent nature, it is hard to believe he would allow

Lawrence to take the watch and abscond with it, against his will. After Lawrence was

given the watch, she treated it as her own: she took it to a pawn shop for safekeeping,

2 RR 89:24-90:6, 101:21-24, and refused to allow Noble to commit insurance fraud

by claiming the watch had been stolen. 2 RR 88:3-89:21. The court below could hear

this evidence and find Noble gave Lawrence the watch.

In arguing to the contrary, Noble ignores both the burden of proof placed on

him and the standards of appellate review. The evidence set forth above is more than

sufficient to overcome a no evidence challenge, and is not against the great weight

33

and preponderance of the evidence. *York*, 487 S.W.3d at 642. The record has many instances where Noble trying to "buy" Lawrence with property; he does not challenge these transfers as gifts, only the gift of the watch. Noble claims such a gift is an "unusual" one to give a woman, A. Br. at 46, an assumption on his part, wh ich also ignores his own expressed purpose. 2 RR 87:19-21 ("I love [the Rolex] more than anything else in my world[3] ... this [act of giving it to you] should show how serious I am" in promising to reform). He claims pawning the watch is "hardly necessary if the person in possession is the owner," an argument that ignores: (1) only the owner of an item may pawn it; and (2) Lawrence's extensive testimony regarding her well-grounded fear that Noble would come to her home, 2 RR 73:6-19; (3) his own obvious interest in gaining possession of the watch, to prevent the police from learning he had made a false insurance claim when he reported it stolen. 2 RR 88:14-23.

Arguments based on cherry-picked testimony and stacked assumptions that Noble believes supports his position does not prove the trial court's finding of gift is wrong, and so does not support his request that the judgment be reversed. Because the trial court's conclusion is supported by legally and factually sufficient evidence, it should be affirmed.

---

[3] Including Lawrence, apparently.

Wherefore, premises considered, Lawrence prays the Final Decree of Divorce be in all respects AFFIRMED, for the reasons set forth herein.

In the alternative, if the Court believes that any portion of the Final Decree if Divorce is not supported by legally or factually sufficient evidence, Lawrence prays that the portions of the Final Decree of Divorce that are supported by the evidence be AFFIRMED, for the reasons set forth herein, and the remaining issues REMANDED to the court below for a new trial.

Lawrence prays for such other and further relief, general or special, in law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,


/s/ Bird Old, III
Bird Old, III
State Bar No. 15244100
P.O. Box 448
Mt. Pleasant, Texas 75456
Telephone: (903) 572-4331
Telecopier: (903) 572-8831
birdoldiii@yahoo.com

Attorney for Appellee

## Certificate of Compliance

Pursuant to Tex. R. App. Pro. 9.4(i)(3), the undersigns hereby certifies that according to the word count function of the computer program used to generate the document, the portions of the Appellee's Brief subject to the rule contain 8,016 words total and that the text thereof is in 14 point Times New Roman font, with footnotes in 13 point Times New Roman font.

/s/ Bird Old, III
Bird Old, III

## Certificate of Service

The undersigned hereby certifies that, pursuant to Tex. R. App. Pro. 9.5(a), a true and correct copy of the foregoing Appellee's Brief has been sent to Judy Hodgkiss, counsel of record for Noble, 100 North Main Street, Paris, Texas 75460 through the Court's e-filing system, on this, the 12th day of September, 2016.

/s/ Bird Old, III
Bird Old, III

CASE NO. 06-16-00032-CV

_____

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA

_____

KERRY BRYON NOBLE,

Appellant,

vs.

GAYLA RENEE LAWRENCE,

Appellee.

_____

On Appeal from the 62nd Judicial District Court
Franklin County, Texas
Cause No. 11,797
The Honorable Will Biard, Presiding

_____

# APPELLEE'S APPENDIX

_____

# Appendix Table of Contents

Document                                                                    Tab

Findings of Fact and Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpts from trial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Selected Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# TAB 1

**NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA**

## NO. <u>11797</u>

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| KERRY BRYON NOBLE | § | 62ND JUDICIAL DISTRICT |
| AND | § | |
| GAYLA RENEE NOBLE | § | FRANKLIN COUNTY, TEXAS |

### Findings of Fact and Conclusions of Law

In response to the request of Petitioner, Kerry Bryon Noble, the Court makes and files the following as original Findings of Fact and Conclusions of Law in accordance with rules 296 and 297 of the Texas Rules of Civil Procedure.

*Findings of Fact - Divorce*

1. Kerry Bryon Noble and Gayla Renee Noble were married on 10/14/2014.

2. At the time of the filing of this suit, Kerry Bryon Noble and Gayla Renee Noble had both been a domiciliary of Texas for six months and a resident of Franklin County for ninety days.

3. Kerry Bryon Noble is guilty of cruel treatment toward Gayla Renee Noble of a nature that renders further living together insupportable.

4. Kerry Bryon Noble committed the act of assault during the marriage on numerous occasions By, (1) intentionally, knowingly, or recklessly causing bodily injury to Gayla Renee Noble; and (2) intentionally or knowingly threatening Gayla Renee Noble with imminent bodily injury; and (3) intentionally or knowingly causing physical contact with Gayla Renee Noble when Kerry Bryon Noble knows or should reasonably believe that Gayla Renee Noble will regard the contact as offensive or provocative.

5. As a direct and proximate result of Kerry Bryon Noble wrongful conduct of assaulting Gayla Renee Noble, she suffered certain damages including reasonable and necessary medical expenses in the past; reasonable and necessary medical expenses that in reasonable probability will be incurred in the future; loss of earnings in the past; loss of earning capacity, diminution of earning capacity, or both that in reasonable probability will be suffered in the future; physical pain, suffering, and mental anguish in the past; physical pain, suffering, and mental anguish that in reasonable probability will be suffered in the future; disfigurement; physical impairment: and mental anguish.

80

6. The Court Finds that; $250,600.00 if paid now in cash, would fairly and reasonably compensate Gayla Renee Noble, for her injuries that resulted from the assaults committed by Kerry Bryon Noble. With the following amounts for each element of the following damages:

reasonable and necessary medical expenses in the past; $600.00
physical pain, suffering, and mental anguish in the past; $200,000
physical pain, suffering, and mental anguish that in reasonable probability will be suffered in the future; $25,000
disfigurement; $25,000

7. It was necessary for Gayla Renee Noble to secure the services of Bird Old III, a licensed attorney; to prepare and prosecute this suit the court finds that $6,300.52 is a reasonable fee for the necessary services of Gayla Renee Noble's attorney in this lawsuit.

8. The Court finds and confirms that each of the following items are the separate property of Kerry Bryon Noble.

An undivided 1/2 interest in No. 5, Block No. 20, as shown by the official plat of said city;
THENCE South 150 feet with the EB line of said Lot No. 5;
THENCE West 60 feet and parallel with the NB line of said Block 20;
THENCE North 150 feet and parallel with the EB line of said Lot No. 5 to the SB line of said East Carnegie Street;
THENCE East 60 feet with the SBL of said street to the place of beginning, and being Lots No. 4 and 5 and the East 10 feet of Lot No. 3 in said Block 20.
AND BEING the same land described in a deed from Rachel Winkle and husband H. T. Winkle to Fannie E Cooper, dated February 14, 1959, recorded in Vol 452, Page 21 of the Deed Records of Wood County, Texas.

Land Rover Vehicle

9. The Court finds and confirms that each of the following items are the separate property of Gayla Renee Noble.

An undivided 1/2 interest in No. 5, Block No. 20, as shown by the official plat of said city;

THENCE South 150 feet with the EB line of said Lot No. 5;

THENCE West 60 feet and parallel with the NB line of said Block 20;

THENCE North 150 feet and parallel with the EB line of said Lot No. 5 to the SB line of said East Carnegie Street;

THENCE East 60 feet with the SBL of said street to the place of beginning, and being Lots No. 4 and 5 and the East 10 feet of Lot No. 3 in said Block 20.

AND BEING the same land described in a deed from Rachel Winkle and husband H. T. Winkle to Fannie E Cooper, dated February 14, 1959, recorded in Vol 452, Page 21 of the Deed Records of Wood County, Texas which was her property prior to marriage.

2010 Mercedes VIN WDDGF5EB9AR093009 acquired by gift from Kerry Bryon Noble during the marriage and was delivered by both the signing of the title, delivery of physical possession and acceptance by Gayla Renee Noble.

Rolex Watch acquired by gift from Kerry Bryon Noble during the marriage and was delivered to Gayla Renee Noble by Kerry Bryon Noble and acceptance by Gayla Renee Noble

Wedding Ring and any proceeds therefrom

Armoire

Antique Cupboard

Wife's Bedroom suit

Daughter's bed room suit

10. The court finds that the sofa is the community property of parties and it is awarded to Gayla Renee Noble.

11. The acts of Kerry Bryon Noble proven herein constituted an assault on Gayla Renee Noble under the laws of the State of Texas.

*Findings of Fact as Conclusions of Law*

Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

*Conclusions of Law - Divorce*

1.     The Original Petition for Divorce filed by Kerry Bryon Noble and the counterclaim for divorce filed by Gayla Renee Noble is in due form and contain all the allegations required by law.

2.     This Court has jurisdiction of the parties and of the subject matter of this case.

3.     All legal prerequisites to granting a divorce have been met.

4.     The divorce is granted in favor of Gayla Renee Noble on the ground of cruelty as defined by sec 6.002 Texas Family code.

5.     A spouse's separate property consists of: 1.   The property owned or claimed by the spouse before marriage.     2.     The property acquired by the spouse during marriage by gift, devise, or descent.     "Gift" means a voluntary and gratuitous transfer of property coupled with delivery, acceptance, and the intent to make a gift.     If the gift is made to one spouse, that spouse owns the gift as separate property.
A spouse may make a gift to the other spouse, in which event the gift includes all the income and property that may arise from that gift unless the evidence establishes a different intent of the donor at the time of the gift.

6. In a suit for dissolution of a marriage, the court may award reasonable attorney's fees and expenses. The court may order the fees and expenses and any postjudgment interest to be paid directly to the attorney, who may enforce the order in the attorney's own name by any means available for the enforcement of a judgment for debt (Texas Family Code Sec 6.708).

7. A person commits an assault if he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens another with imminent bodily injury; or (3) intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative.

8. The Assaults proximately cause the occurrences or injury in question.

Additional Findings of Fact

12. The Court finds that Gayla Renee Noble suffered a substantial disruption in her daily routine and experienced a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment or anger. The Court finds that as a result, Gayla Renee Noble suffered mental anguish and will continue to experience mental anguish as a result of the assaults by Kerry Bryon Noble.

Signed on April 29, 2016

JUDGE PRESIDING

84

# TAB 2

A. I don't know. However long that is from.

Q. Now, why did you move out two weeks later?

A. Because he was abusing me.

Q. And then why did you go back?

A. Because he promised that we would go to counselling.

Q. Did you go to counselling?

A. We did.

Q. Where did you go?

A. We went to a Ms. Payne first in Lindale.

Q. What year? What month and year?

A. That was in November of 2014.

Q. And at that time y'all were living apart. Correct?

A. No. We were living together.

Q. Okay. But you moved out you said in late October?

A. I was -- I was gone about a week or so.

Q. And you moved to Beaver Street?

A. Yes.

Q. And did you rent that house?

A. I did.

Q. And who paid the rent?

A. A friend of mine gave me the money to rent that.

He filed for a lost title after giving me that.

Q.    Okay.  So your testimony is that he gave you the car?

A.    Yes.

Q.    That he owned before marriage?

A.    Yes.

Q.    And also he owned a house before marriage.  Is that correct?

A.    A house?

Q.    Yes, ma'am.

A.    He's owned many houses.

Q.    The one you're living in currently did Bryon own that before marriage?

A.    Yes, he did.

Q.    And did he deed you one-half interest in that before y'all married?

A.    Yes, he did.

Q.    And that was done -- do you remember when that was done?

A.    I think -- looking back, I believe it was June.

Q.    And y'all didn't marry until October.  Is that correct?

A.    That's correct.

Q.    How did you meet him in June of 2014?

A.    How did Bryon and I meet?

Q.   Yes, ma'am.

A.   I had gone to board my dog, and in the back of Winnsboro Real Estate -- in the front of the house -- in the back of that, excuse me, is a dog boarding/grooming place.  And in the front of that is set up -- and Bryon had a desk set up in that office, and we met because I had gone in there for the purpose of looking about -- checking about my dog.

Q.   How long did you -- had you known him before he deeded you a one-half interest in property?

A.   Not long at all.

Q.   Did you ask him to do that?

A.   Absolutely not.

Q.   Were you surprised by that?

A.   Yeah.  I didn't really -- yes, I was surprised by that.

Q.   So as far as that home, it technically is one-half yours and one-half his separate property?

MR. OLD:  Objection.  Characterization of the question being technically.  It either is or it is not.

THE COURT:  I'm going to sustain it as to separate property --

MS. CHISM:  Okay.

Q.   So you and Bryon are one-half owners in that

Q.   What else?

A.   I want -- I want -- I don't know how -- how do you put a value on -- on -- on what he's done and my worries about work, my worries about my -- about what's going to happen to me.  I don't know what's going to happen.  I don't know.  I don't know how much counselling I need.  I have no idea.  I don't know what I need.  I don't know these things yet, but I know that it's because of him.  He did that.  I begged him not to over and over and over again.  Let's work this out.  Let's please try. We're going to try.  We're going to do -- and it was on and on and on.  I think he deserves to pay me for something to -- to fix me.

Q.   Money?  That's what you want?

A.   And I don't know how to make that happen.

Q.   Money?

A.   And if you --

Q.   That's what you want, isn't it?

A.   I believe that I do deserve something, yes.

Q.   That's money what you've gotten out of your last four marriages?

A.   Ma'am, never.  Never --

Q.   You walk in here --

A.   -- never -- no.  Excuse me.  Don't say what I did with my last four marriages because I assure you I

Q. Did you have an attorney from Sherman contact me?

A. Absolutely I did.

Q. So at that point if this horrible human being was so awful, why did you not pay that attorney to finish the divorce then?

MR. OLD: I'm going to object to the relevance of the question.

MS. CHISM: Your Honor, she's going to come in here and ask for all this money --

THE COURT: Overruled.

A. I wanted a marriage. I did not want to give up on him. I didn't want to give up on him.

Q. But you're coming in here describing him as a monster. That's horrible --

A. Oh, you don't even know.

Q. -- human being --

A. You have no idea.

Q. Whether he is or he isn't, ma'am, you had the opportunity to walk away in two weeks, did you not, when the divorce was filed by him? Not you. Him. Correct? And at that point, y'all had bought a sofa. Correct?

A. I'm telling you that man promised me and promised me and promised me and promised me, begged me not to leave, begged me, please stay with me. Let's make

this work. Let's do it. I'm going to go to counselling. We're going to go do all this. We're going to go to church. We're going to. Don't leave me. Don't leave me. Don't leave me. Don't leave me.

Q. And you met --

A. Stay with me.

Q. How long did you live in Sherman? It was about two months, wasn't it?

A. I went and stayed at my sister's.

Q. For about two months?

A. It was about six weeks.

Q. And so where -- so you weren't with Bryon then at all?

A. No, I was not.

Q. And then when you moved back, you moved in -- you came from Sherman. You moved to a home on Highway 11. Is that correct?

A. I didn't move in. I had -- I had nothing. I didn't even have clothes.

Q. Did you move back in with Bryon, or did you move into a home on Highway 11?

A. I was basically homeless at that point.

Q. Where did you move when you moved --

A. I was living no where.

Q. -- back from Sherman? Where did you --

Q.    Uh-huh.

A.    -- that I could move back -- that he would have that house -- a renter move out of the house, that I would go into that house.  I would have the car.  I would have the -- the house on Carnegie.  He would stay at his mom's until that -- until he got a renter out of there and moved her to a different one of his houses.

Q.    Did that happen?

A.    No, it did not.

Q.    So did you leave then?

A.    Where was I going?

Q.    Do you work?  Did you work?

A.    No.  He didn't let me work.

Q.    And you've --

A.    Had no money.  I had nothing.  Nothing.

Q.    What did you do before you met Mr. Noble?

A.    I was a nurse.

Q.    So could you not go back to being a nurse?

A.    He wouldn't let me.  He did not let me.

Q.    Was your license to be a nurse revoked?

THE COURT:  Hold on.  Stop --

A.    No.

THE COURT:  Stop just a second.

A.    No.  I'm going to say no.

THE COURT:  Would you stop just a second,

A.    My job.

Q.    What was your job?

A.    I was working -- I was a charge nurse at one of the nursing homes here in town.

Q.    So you were a charge nurse up until two weeks ago you said?

A.    Yes.

Q.    And how much were you making as a charge nurse?

A.    There, I believe, I was making 19.

Q.    $19 an hour?

A.    $19 an hour.

Q.    And how long had you been working at that job?

A.    Since school started, so around August maybe.

Q.    What did you do all summer?

A.    I was depressed.  I didn't really function very well.

Q.    How did you pay your bills this summer?

A.    From that ring that I sold is how I had to buy furniture and get my -- we didn't have even a toothbrush.

Q.    Where were all the kid's clothes and your clothes from before?

A.    A lot of it Bryon had kept.

Q.    Did Bryon give you money?

A.    No.

Q.    As far as any injuries that you claim you

sustained, tell me those injuries.

A. That I sustained during the marriage?

Q. That required medical attention.

A. That required medical attention?

Q. Uh-huh.

A. Okay. I -- well, from what would have required medical attention or what did? I should have gone to the hospital --

Q. No. I want you to tell me --

A. No. No. I'm telling you what required -- what required means is --

MS. CHISM: Objection. Nonresponsive.

THE COURT: Sustained.

Q. What medical expenses do you have that relate to any injuries you claim Mr. Noble caused? Tell me the medical expenses you've paid or that you have due.

A. It's approximately, I'm going to say, about $600.

Q. That's how much you've paid, or that's how much is due?

A. I've paid part of that.

Q. And who is that paid to?

A. Tim Davis.

Q. When -- who is Tim Davis?

A. He is a chiropractor. And he's --

Q.  And when did you start seeing Mr. Davis?

A.  I think that was in June.

Q.  This summer?

A.  I think so.

Q.  What I'm -- when I say this summer, I'm sorry, I mean last summer.  Last summer what happened to cause you to see Mr. Davis?

A.  Gosh.  I just hurt all the time.

Q.  What hurt?

A.  Everything on my body.  I had been -- that man had been hitting me daily.

Q.  Daily since when?

A.  Daily -- well, when you think about it, from -- he started hitting me the day after he married me.  He hit me at least three times a week from the very beginning.  Then when I went back in February, it was five to six, and then it became almost on a daily basis, and so my body hurt all the time.

Q.  So $600 is the only amount of money you've spent right now?

A.  Yes.

Q.  And how many times did you see Mr. Davis?

A.  I'm not sure.

Q.  One time, two times, three times?

A.  No.  No.  Eight, ten -- I don't remember

really.

Q. Are you seeing Mr. Davis right now?

A. No, I'm not.

Q. Are you right now seeking any type of medical treatment?

A. No. I have no money to go to seek medical treatment.

Q. What medical treatment do you think you need?

A. I need a whole lot of counselling -- a whole lot of counselling.

Q. Have you been to a counselor at all?

A. Yes, I have.

Q. Who?

A. Deborah Chelette -- Deborah Chelette. She's in Winnsboro.

Q. When did you see her?

A. I started going -- I only went to her twice. That was maybe six weeks ago or longer.

Q. Did you have to pay for that?

A. I did.

Q. How much was it?

A. I'm thinking it was $50 a time. I think. I think.

Q. But you've only been twice?

A. Do what?

Q.   You've been twice.  Any other counselling that you've gotten?

A.   Not since Bryon and I split, no.

Q.   When you were living with your sister, did you reach out up there in Sherman?

A.   I didn't even -- I was doing good to walk out the door.  I didn't hardly walk out the door.

Q.   Any other property that you've thought of since you've started your testimony that's been bought during the marriage, other than furniture in the home?

A.   I can't think of anything.  I can't think of anything.

Q.   What have you bought?  You said you bought all new furniture.  What did you buy?

A.   I bought a bed for my bedroom.  I bought a sofa.  I bought a TV.  I bought a kitchen table.

Q.   What about washer, dryer, refrigerator?

A.   I did actually.  Yes, actually I did.  Not a refrigerator, no.

Q.   Just a washer and dryer.  Do you know how much all that cost?

A.   I could not tell you.  I'm telling you -- I'm focused on his criminal stuff.  That is totally -- I mean, I'm just -- if -- that consumes my life.  I don't function well.  Okay.  So I'm sorry if I can't recall.  I

Q.   When y'all met in the summer of 2015 or early spring, is that correct?

A.   '14.

Q.   Huh?

A.   '14.

Q.   '14.  Okay.  I believe you said you met at the dog groomers.

A.   Yes.

Q.   Was he running the dog groomers or working in the real estate office or do you know what he was doing?

A.   Do I know what he was doing?

Q.   Did he appear to work in that building?

A.   He appeared to work in that building.

Q.   Did he approach you -- approach you romantically and ask you out?

A.   Yes.

Q.   How quickly after y'all met did he do that?

A.   Pretty -- pretty -- a day or two.

Q.   Huh?

A.   A day or two after that.

Q.   Okay.  And did you know him at that time?

A.   No.

Q.   Did you know of him?

A.   I had heard his name.

Q.   Okay.  And that was -- your recollection that,

I believe, you said was -- it was early June?

A.   Yeah, it was around there.

Q.   Okay.  Did y'all start dating then?

A.   Yes.

Q.   Did he tell you that he was going to buy you a car?

A.   He did -- he did buy me a car.

Q.   How soon after y'all met did he buy you a car?

A.   Gosh, within a couple of weeks.

Q.   Within two weeks?

A.   Yes.

Q.   And what kind of car did he buy and provide you?

A.   It was a Range Rover.

Q.   Was it a new Range Rover?

A.   No.  It was a few years old.

Q.   A couple years old?

A.   Yeah.

Q.   When he told you he was going to get you a car, what were you expecting, if anything?

A.   Just a car -- regular car, Toyota, Ford, you know, something like that.

Q.   Okay.  Did you pick that car out?

A.   No.

Q.   How did you get that car?  How was it brought

A.   I think he gave me the car first.

Q.   Okay.

A.   You're talking about the Range Rover?

Q.   Yes.

A.   Yes.

Q.   The Range Rover, yes.

A.   Yes, he did.

Q.   Now, did he tell you anything about having been -- having been in the federal penitentiary?

A.   Yes, he did.

Q.   In what point in time in y'all's relationship did he share that with you?

A.   About a week or so after we met.  He --

Q.   What did he tell you?

A.   He said that -- because I noticed I didn't -- you know, I wasn't seeing him in the evening times.

Q.   What do you mean you weren't seeing him in the evening times?

A.   He was coming to the house at 9:00.  He wanted me ready at 9:00 in the morning and -- for when he arrived.  And then I would spend the day with him and -- just with him working.  And then about 4:00 in the afternoon he had to leave and go to Tyler.  And then about a week into it -- but I didn't -- I didn't ask.  I just -- I didn't know where -- but then he told me that.

He said I want to tell you.

Q. Why did he tell you he had been to the federal penitentiary?

A. That he had had someone to burn down one of his laundromats in Mount Pleasant, and that he had been found -- you know, he got caught and found guilty, and that he had gone to prison for that, and that -- and then he told me he was actually -- where he was going in the evenings was in a halfway house in Tyler.

Q. Okay. In other words, he was going back to the halfway house every night.

A. And then he was supposed to be working, and then he ended up -- yes, he got in trouble because of spending it with me.

Q. Now, did y'all continue in a relationship? How long did he continue to live in the halfway house?

A. Not long.

Q. Did he start living with you or you with him?

A. Well, I moved into the house at 807 North Main.

Q. Were you in -- in relations the middle of June, before or after?

A. I'm going to say late June. It was in June.

Q. Okay. And was he staying there then, or did he start staying there?

A. Well, he was in the halfway house, and so --

when he got kicked out of the halfway house, then he spent -- it was like two or three days before the federal authorities picked him up.

Q. When you say he got kicked out of the halfway house, did he tell you that he had been kicked out?

A. Yes.

Q. And why had he been kicked out, if he told you?

A. Because the rules were that he was only supposed to come to work and could not do anything outside of work. He was actually even supposed to bring a brown paper bag to eat lunch. But by spending -- he had been having that time with me and so they --

Q. Did you go with him at one time and meet his -- a person who purported to be his parole officer?

A. Yes.

Q. Okay. And where were they? Was that in Tyler?

A. That was in Tyler.

Q. Okay.

A. That was after he had been kicked out.

Q. Huh?

A. After he had been kicked out, yes.

Q. He took you there?

A. Yes.

Q. Did you have a conversation with you, he, and the parole officer?

A. We were all three in there together.

Q. Huh?

A. We were all three in there together.

Q. What did y'all talk about?

A. That Bryon had had a history of keeping -- breaking the parole -- I mean, breaking the rules, that he -- he had already shown a history of that.

Q. Okay.

A. And that, you know, I wanted to know is everything going to be okay. You know, is he okay, and is all that going to work, and work out.

Q. Did Mr. Noble tell you why he took you there?

A. Yes. He wanted me to speak on his behalf.

Q. Wanted what?

A. He wanted me to speak on his behalf --

Q. Okay.

A. -- you know.

Q. Shortly after that, did officers show up at the house that y'all were living in and arrest him?

A. Yes, they did.

Q. Do you recall what date that was?

A. I'm sorry. I don't. It was in July.

Q. What?

A. I think it was July.

Q. Was it shortly after the 4th of July?

A.   Yes, I think it was.

Q.   Okay.  From that point until shortly before you married, did he live in Mount Pleasant at the Titus County Jail?

A.   Yeah.  He was at Mount Pleasant for 90 days.

Q.   That was his punishment for whatever the --

A.   Breaking the rules, yes.

Q.   And did he get out of the Mount Pleasant jail about the middle of October?

A.   Just a couple of days before.  I think it was -- must have been, like, the 12th.

Q.   Okay.

A.   I remember -- I think it was on a Sunday.

Q.   And y'all got married what date?

A.   The 14th.

Q.   Up until he got out of jail, from the time that you had met him had he committed any act of violence against you?

A.   Uh-uh.  No.  Are you talking about before we got married?

Q.   Yeah, before you got married.

A.   No.  No.

Q.   And y'all got married what date?

A.   I believe it was October 14.

Q.   Okay.  And did you get married in Texarkana?

A.   Yes.

Q.   Arkansas?

A.   Yes.

Q.   And did y'all go on a trip or a honeymoon?

A.   That -- we got married on -- it was, like, on a Monday or Tuesday, and then I think it was, like, that Thursday or Friday.  It had been planned for us to go to Dallas for the weekend, and that's what we did.

Q.   And where were y'all to stay in Dallas?

A.   The Adolphus.

Q.   Did y'all check into the Adolphus Hotel?

A.   Yes, we did.

Q.   And tell us -- was that for that night?  Was that to be your honeymoon?

A.   Yes.

Q.   Okay.  Tell me what happened that evening. Like, did y'all have dinner or go out or --

A.   We had a whole weekend that he had planned and --

Q.   I'm asking you about that night, what you did that night.

A.   That night -- that night we didn't go do what we had -- what he had planned that we were going to do. We went, and I remember that evening -- we, basically, went and had dinner in the room.

Q.   Okay.  Was it a romantic dinner?

A.   Trying to make it romantic.

Q.   And did you go to sleep at any time?

A.   I did.  I fell asleep.

Q.   Okay.  After you fell asleep, what was the next thing that happened?

A.   He woke me up by the hair of my head being jerked out of the bed.  He was whipping me, throwing me across the wall -- into the wall and then throwing me across the room and just wouldn't --

Q.   Was there a knock at the door?

A.   Yeah.

Q.   Did he ultimately answer the door?

A.   He did.

Q.   And who was at the door?

A.   Staff of the hotel.

Q.   Okay.  And what did they require of y'all at that time?

A.   They wanted us to come downstairs.

Q.   Okay.  Did you and he go downstairs?

A.   We did.

Q.   Did y'all have a meeting with them?

A.   There was two officers.

Q.   Do you know if they were security officers, police officers, or --

A. They looked like police officers, but I don't -- I mean, I'm saying the way they --

Q. They were in uniforms?

A. Yeah, they were in uniforms.

Q. And I'm talking -- I'm talking about conversations when you and Bryon were both present.

A. Yeah.

Q. Did they tell you -- you and he that y'all had to leave the hotel?

A. Yes.

Q. Did he at any point tell you why he woke you up by the hair of your head and was beating on you?

A. Yes. He said that -- that he had gone downstairs and that I didn't go look for him.

Q. You didn't what?

A. I didn't go look for him.

Q. Okay. Why didn't you go look for him?

A. I didn't know he left. I was asleep.

Q. Was there another gentleman that came into that meeting or approached y'all there?

A. Yes.

Q. And how did he relate to this situation?

A. He came up, and he said please don't --

MS. CHISM: Object to anything he said, Your Honor. Hearsay.

A. I honestly do not know.

Q. You don't remember?

A. I honestly don't remember. Because within that week, I had already been beat twice by him.

Q. You got what?

A. He beat me twice in that week.

Q. And where else were you when you were beaten?

A. Excuse me?

Q. Where else were you? What location?

A. Well, the day -- at home, 807 North Main.

Q. Somewhere around after y'all had been together two weeks, is it Beaver Street that you moved to?

A. Uh-huh.

Q. And you stayed there somewhere between a week and a half and two weeks?

A. Yes.

Q. And you went back to live with Bryon?

A. Yes, I did.

Q. Did he ask you to?

A. Yes.

Q. Did he make promises to you to get you to come back?

A. Yes.

Q. What were -- I mean --

A. He promised me that we would go to church,

promised me we would go to counselling, promised me -- I think at that time that's pretty much -- we were just going to -- that he would not hit me anymore, not -- he would stop all that.

Q. You went to a counselor in, I believe you said, November. Is that correct?

A. Yes.

Q. And did y'all go -- did you and Bryon go together?

A. Yes, we did.

Q. And was that for marriage counselling?

A. It was for marriage counselling.

Q. Okay. And how many sessions did y'all have with that counselor?

A. I'm going to say about four or five -- approximately four or five.

Q. The last time that y'all were there did -- after that did Mr. Noble refuse to go back to that counselor?

A. Yes, he did.

Q. Why did he tell you he would not go back to that counselor?

A. Well, the last day that we were there, as we were leaving he started hitting me in the car.

Q. Okay.

A. And she saw it, and he wasn't going -- he -- he wouldn't go back because she knew.

Q. Do you know for a fact she saw it, or is that what Mr. Noble thought?

A. That she saw?

Q. Yeah.

A. No. She came -- she came out, and she said, Bryon, I saw --

MS. CHISM: Objection to anything she --

A. -- what you did.

MS. CHISM: -- that is hearsay.

Q. She came out while it was going on. Is that correct?

A. Said she had watched it through the window.

Q. And you and Bryon -- she said that to both of y'all?

A. Yes.

Q. Now, at any point in time did Bryon ever tell you he had been convicted in Wood County for family violence?

A. Yes.

Q. Okay. When was that in y'all's relationship? Before or after you were married?

A. It was after we were married.

Q. I want to show you what has been marked as

series of events where you were physically assaulted by Bryon?

A. Yes.

Q. And where did those events occur?

A. Those were primarily at 807 -- at our home, 807 North Main.

Q. And did you go to report those -- that event to the Winnsboro police on January 21?

A. Yes, I did.

Q. And in that event and those assaults would you tell the Court what Mr. Noble did to you and over what period of time?

A. During the ones before --

Q. -- before --

A. -- before January 21 that I reported?

Q. The week before -- the week before January 21 everything was --

A. I -- I think -- this was many, many times, but I think on this particular time I think that was when he did -- poured coffee on me.

Q. Do what?

A. I think that was when he poured coffee. He kicked me. He -- he hit me, kicked me in the head, hit me in the head. He put scarves down my throat, shirt down my throat, held me down by his knees. I remember he

let me --

Q. What do you mean he put scarves down your throat?

A. Scarves down my throat. He put -- I was crying. I was hurting. Because I wouldn't quit crying, he put scarves in my mouth. He was hurting me. And then he would take it out if -- he would take it out and try again for me to quit crying. And I couldn't quit, and so he put them back. And then he -- oh, he was getting the -- a ring off my finger. He was telling me he was going to break my hand, break my finger. I don't know. He just let me sit up Indian style if I would stay in that position. It's just a -- just an ass whooping.

Q. When you went to the police department on the 24 --

A. 21st.

Q. -- did they take photographs of you?

A. Excuse me. I'm sorry.

Q. Did they -- when you went to the police station on the 21st --

A. January 21st. It was my mother's birthday.

Q. -- they photographed you. Isn't that correct?

A. Yes.

Q. I want to show you what has been marked R-3 and ask you if those photographs reasonably depict the

condition --

A.   In that period.

Q.   -- that -- if the photographs depict the condition you were in on January 21?

A.   Yes.  Yeah.

Q.   Okay.  And I want to show you Respondent's 4 and ask you if that -- if those are more photographs that were taken of you on that day?

A.   Yes.

Q.   And they depict the condition that you're in?

A.   Yes.

Q.   Okay.  That you were in on that day?

A.   Of the physical -- of the -- yes, what you could see.

Q.   I am looking at R-3.  The top photo -- excuse me.

MR. OLD:  We would offer R-3 and 4 into evidence.

(Respondent's Exhibit Nos. 3-4, offered)

MS. CHISM:  No objection.

THE COURT:  It will be admitted.

(Respondent's Exhibit Nos. 3-4, admitted)

Q.   Does the top photo on R-3 -- what part of your body is that?

A.   That's my arm.

Q.   Is it your right arm or your left arm?

A.   I think that's my right arm.  I think.  Yeah, it's my right arm.

Q.   Okay.  And what does that show in the top, other than your arm?  Does it show any injury to you?

A.   Uh-huh.

Q.   Okay.  Can you still see that injury today?

A.   Yeah.  I have scars from that.

Q.   Okay.  And the lower photograph on R-3, what part of your body is that?

A.   I think that was from my arm.

Q.   Okay.  And it shows a bruise on your arm?

A.   Yes.

Q.   Are those things still visible?

A.   The bruises?

Q.   Yeah.

A.   No.

Q.   Can you -- do you have a scar or anything from where -- the top photo, can you still see where you were injured there?

A.   Yeah.  I have scars on my arms.

Q.   Okay.  Will you show me?

A.   (Witness indicating).

Q.   And hold your -- will you point to where that was?

A. All this right there. (Witness indicating).

Q. Okay. Now, as to R-4, the photo the sticker is on what part of your body is that?

A. That the sticker is on?

Q. No. What part of your body is this photo reflecting? The lower photo?

A. That's my right -- right -- my right upper outer thigh.

Q. Okay. And the top photo of your leg and that would be your right leg that's predominant in the photograph?

A. That's -- yes. That's my right shin.

Q. Okay. Do you still have a scar there?

A. Yes, I do.

Q. How long after the 21st did you go back to Bryon, if you did?

A. After I left before I went back? I mean --

Q. Yes.

A. I was back home February-ish.

Q. Okay. I'm going to ask you the same question Ms. Chism did. Why did you go back to him?

A. That time?

Q. Yes. I mean, why?

A. That -- when I went back after that because Bryon said that he would not -- he would -- he would

it's hard. He did not move out?

A. He did not move out. And at some point during that he wanted to -- you know, he said he was trying to make it work.

Q. Okay. Did he appear to be sincere?

A. When he said it?

Q. Yes.

A. Absolutely.

Q. I mean, did you believe him?

A. Yeah, I did. I wanted to believe him.

Q. Okay.

A. And I thought if we just got counselling it would -- it would work.

Q. You know, you have a scar above your nose or on your nose?

A. In between my eyes.

Q. Huh?

A. In between my eyes, yes.

Q. How did you get that?

A. He hit me with a metal wall hanging.

Q. Okay. I show you what has been marked R-5. Is that a picture of you that was taken yesterday?

A. Yes.

Q. Okay. Does it accurately reflect how that injury looks today?

A. Yes.

Q. And that's the scar right here?

A. Yes.

(Respondent's Exhibit No. 5, offered)

THE COURT: Any objection.

MS. CHISM: No objection.

THE COURT: It will be admitted.

(Respondent's Exhibit No. 5, admitted)

Q. You're referring to --

A. Yes.

Q. -- at the top of the bridge of your nose?

A. Yes.

Q. Now, you are an LVN, are you not?

A. Yes.

Q. Okay. At the time you and he married did you have a license?

A. Yes.

Q. Okay. Did it come up for renewal?

A. Yes. It did very quickly come up for renewal.

Q. And were you working at that time?

A. No.

Q. And did you ask Bryon for the money to renew your license?

A. Yeah, I did.

Q. Okay. Would he give you the money?

A.   No.

Q.   Huh?

A.   No.

Q.   Did you also -- do you have a license right now?

A.   Yes.

Q.   And were you without the ability to practice your profession for some period of time after you and he separated because you had to renew your license?

A.   That -- well, there were a couple -- there were a few reasons involved in that.

Q.   Right.  I mean, there was a time --

A.   Yes.

Q.   -- you couldn't work because you didn't have a license?

A.   Yes.

Q.   How long have you been an LVN?

A.   Twenty years.

Q.   Huh?

A.   Twenty years.

Q.   You last worked when?

A.   A couple of weeks ago.

Q.   Okay.

A.   Yeah, whenever the trial --

Q.   You were -- you were a witness at a criminal

trial where Mr. Noble was tried --

A. Yes, I was.

Q. -- last month. Is that correct?

A. Yes.

Q. You got home after that was over and did you hear from your employer?

A. Yes, I did.

Q. Okay. And were you terminated?

A. I was laid off --

Q. Okay.

A. -- is what they said, laid off.

Q. How do you feel about your ability to work as an LVN today?

A. Not very good.

Q. Do you question your ability?

A. I do.

Q. Why?

A. I never have before, but I do now.

Q. Why? What is your concern?

A. You have to -- you have to walk -- when you're taking care of people, this is their lives. I have to make a judgment. I have to make a good decision. I have to -- I have to be really confident in what I'm doing each -- I mean, it's a -- it's a very fast paced job that I do. And I have to relate to these people that I'm

taking care of, and I'm very -- I don't feel good right now. I don't feel -- I'm not going to say I don't feel safe, but I walk in -- I question my judgments right now. I question my ability to make a good -- good, safe judgment, and so I'm -- I'm nervous a lot at work. And I was never that way before him. I wasn't.

Q. Are you looking at or training for a new job at this time?

A. I know that I have to. I need to step away from -- until --

Q. Okay. What --

A. Yes. I need to step away from taking care of a patient right now.

Q. Okay. What are you training for? What are you trying to be?

A. I'm looking at freight brokering right now.

Q. Okay. And who introduced you to that?

A. Russell Johnson.

Q. Is that a friend of yours and a friend of Mr. Noble or acquaintance?

A. Yes.

Q. Did they work together in freight brokering at one time or have you been told that?

A. Actually, I haven't been told that. When I was Googling something, I saw something about it. Their

names were together.

Q. Okay. And you are training right now?

A. Yes.

Q. Okay. What other -- what other things has the abuse caused you to do emotionally?

A. I can't tell you the last time I've slept in a bed. I do not sleep. I sleep on a couch.

Q. Why do you sleep on the couch?

A. I never -- I always have to be alert. I don't trust him. I'm -- he knows that I'm scared of him. I'm scared -- I don't know what -- who all he has. Bryon is known he has goons from here to Chicago. I mean, he constantly had somebody doing something bad for him. He's already sent somebody to my house once. I know that he would do it again. He always threatened it. He's threatened to burn the house with me in it. He's threatened me and threatened me and threatened me. Why would I not -- he's told me all these horrible things he's done to people. I don't sleep.

Q. What has he told you he's done to people?

A. What has he told me he's done to people?

Q. What has he told you he's done to people?

A. Oh, my goodness.

Q. Just give me an example.

A. He's told me that he set fire to a car of a

previous wife. He's told me lots and lots of abuse, lots of abuse, things that he's done to people.

Q. And you can't sleep at night?

A. When I finally -- when I finally doze off, I get just very few hours of sleep. I don't -- I don't go -- I -- I feel so disconnected from -- I feel disconnected. I don't -- like, just relating, I mean, everywhere I go or I -- I don't feel comfortable going places to -- just to even communicate with people. I don't do well. I just -- I've always been confident. I've always -- and now, I just don't. I don't even know all my emotions right now. I don't even know what they are.

Q. Do you cry a lot?

A. Yes. And I'm not a cryer, and that seems like all I ever do.

Q. Do you ever cry when you're alone?

A. Yes.

Q. Gayla, do you have physical -- I mean, physical pain? Do you hurt physically?

A. Yes. I hurt every day.

Q. Where do you hurt?

A. I hurt a lot in my hips and the sides of my legs a lot.

Q. Okay. Over the years you've had some back

problems, have you not?

A. Just from, like, lifting and things like that.

Q. Okay. But in the periods of time, a couple of years before you met Bryon were you having back issues?

A. No. Uh-uh. No. When I met -- when I met him, I walked five miles a day. I was -- I walked into that marriage in good shape, feeling good, feeling healthy. I walked out -- he freakin' -- his words were I will bring you down. I will destroy you.

You told me that over and over and over. You won't walk out of here. You won't walk out of here. You won't walk out. You won't walk out of here alive today. How many times did you tell me that?

And he's pretty much -- he's pretty much going -- he's pretty much winning.

Q. You have a scar on your nose?

A. Excuse me?

Q. You have a scar above your nose?

A. I do.

MR. OLD: Last exhibit number?

THE COURT: This will be 6.

Q. I want to show you what has been marked as Petitioner's (sic) Exhibit 6 and ask you if you're familiar with what it depicts?

A. That's the house that I'm living in.

(Respondent's Exhibit No. 8, admitted)

Q. Does it embarrass you or bother you that you have the scars on your legs and your arms?

A. Yes.

Q. Does it prevent you from doing anything?

A. Just life in general keeps me from doing anything.

Q. Huh?

A. I don't know if it's related to scarring. I don't know. It's just everything relates -- keeps me from doing anything.

Q. But, I mean, are you -- are you embarrassed by those things?

A. Yes.

Q. Do you often wear shorts in --

A. Yes.

Q. Okay. And have you been able to afford to go somewhere and have those scars repaired --

A. No.

Q. -- or, I guess, what you call cosmetic surgery?

A. No.

Q. About how much money do you have to your name today?

A. Maybe $100.

Q. Okay. The $9,000 that you sold the ring for,

ANNA M. UPCHURCH - OFFICIAL COURT REPORTER - (903) 737-2434

property, furniture, keepsakes, clothing that are still in his possession that you owned prior to marriage?

A.  Yeah.  I ended up getting some of my clothes and stuff, and he still had clothes.  He still had some things of my grandmother's.

Q.  Okay.  And what are the things of your grandmother's?

A.  I have an armoire, and it's like an antique -- like a -- what you would keep -- a cupboard, what you would keep dishes in, buffet.  I have a bedside table -- or a table, end table, that's marble top.  That was my grandmother's.  I'm just -- there were some personal things, you know, of my daughter's and mine and -- but he said they're all gone.  There's been people in town wearing my things.

Q.  You've seen people wearing your clothes and --

A.  Yes.  And then people tell me, you know, hey, so and so, you should see.  She's got your stuff, or she's got your purse that you had and --

Q.  Gayla, you testified in Cause Number 9031, styled State of Texas versus Kerry Bryon Noble that was tried in this Court, did you not?

A.  Yes.

Q.  In that case there is State's Exhibits 1, 2, 3, 4, 5, and 6.  Is that correct?

A.   I --

Q.   Okay.  And those are pictures that you identified as being you and reflect the condition you were in at the time they were taken?

A.   Yes.

Q.   Defendant's -- State's Exhibit 5 shows -- excuse me.

MR. OLD:  I saw you looking at them.

Q.   -- shows your face, and you have black eyes.  Is that correct?

A.   A black eye, yes.  And then on the --

Q.   And where -- when was -- when was that picture taken?

A.   When?

Q.   Yeah, when?

A.   That was in -- I believe in June.

Q.   Okay.  And was it taken over in Hopkins County?

A.   No.

Q.   Okay.

A.   No.

Q.   Where was it taken?

A.   This was taken by Tim Davis.

Q.   Okay.  It was taken by Tim Davis.  Okay.  How did you get that black eye?

A.   He slammed my face into the dashboard.

The clerk is going to get me.

THE COURT: We'll clean it up afterward. Let's move on. Okay.

Q. In June of last year did Mr. Noble assault you in Hopkins County, Texas?

A. Yes.

Q. And did the Hopkins County Sheriff's Department come to your rescue?

A. Yes.

Q. And was he detained at that time?

A. Yes, he was.

Q. Tell us what -- the injuries that he gave from you -- gave to you at that time?

A. It mainly was my neck at that time. His -- he tried -- he choked me during that -- that time. A lot of hitting in the head. He -- just hitting me. I don't know how to explain that. You know, when you're -- when someone is hitting you --

Q. Do you recall being slammed into the dash?

A. Like -- actually, I was -- he had me back and my feet came up, because I was behind the steering wheel. So, no, we were just -- it was just -- throwing me all over, you know, as much as he could with me pinned under the steering wheel.

Q. Were you -- had you made a 911 call when all of

(Respondent's Exhibit No. 12, admitted)

Q.   You are familiar with the fact that he's been indicted for insurance fraud, are you not?

A.   Yes, I am.

Q.   And did you report that to the Winnsboro authorities?

A.   Yes, I did.

MR. OLD:  We would offer 12 if we haven't.

THE COURT:  Thank you.

Q.   Did you have in your possession a Rolex watch?

A.   Yes, I did.

Q.   And how had you come in possession of that watch?

A.   He gave it to me.

Q.   What did he tell you when he gave it to you?

A.   He had just beat on me and he said that he didn't want me to leave, didn't want me to go to the police, and said he loved that, took it off his wrist. He said, you know, I love this more than anything else in my world.  And he said, this should show you how serious I am.

Q.   And he made a gift of it to you.  That was your conclusion from what he said?

A.   Yes.

Q.   Shortly before August 7, 2015, did you have a

conversation with Mr. Noble regarding that watch?

A. Wait. Say that to me again.

Q. Shortly before August 7, 2015, did he call you and tell you anything about the watch?

A. Yeah. He talked to me. He asked me -- or I remember it.

Q. What did he say --

A. Exactly --

Q. -- to you at that time?

A. Exactly he said, who all knows you have the watch. I said, a few people know. And he said, who exactly. He wanted the names of the people who knew I had it, and I told him I wasn't going to give it -- give him the names. And he said -- he asked me had I ever told a police officer that he -- that I had that watch -- had I ever told them that. And I didn't think so. And he said that he -- that it was being -- that he had reported a robbery there at the house and that he shown that watch, along with some other things, and he said he was going to pin it on his cousin and wanted me to back up his story.

Q. Okay.

A. Not happening.

Q. On August 7, 2015, what did you do with that watch?

A. Ultimately what did I do with the watch?

Q. Let me show you --

A. I don't know the dates.

Q. Would this document refresh your recollection?

A. Okay. That's when -- I asked Bryon to call and say he found that watch. You tell them anything but do not file a false claim. Do not do this. Do not commit another crime. And he refused, refused, refused. I kept asking him, please, please. He kept refusing.

Q. Okay.

A. And so I called the insurance office. And I said, had somebody filed a claim. I asked, did Bryon try to file a claim on -- or does he still have that watch insured. And they said that he did. And I asked if he had filed a claim. And they said that there was a claim pending. I think is what they said. I didn't give my name -- well, yes, actually, I think I may have.

Anyway, I told her -- I said, I'm asking you, please, do not pay out -- if you have not already paid, do not pay on that. Don't pay one dime on it. And -- and I went to the Winnsboro Police Department.

Q. Okay. Did you deliver the watch to them?

A. Yeah, I did. I gave them the watch that day.

Q. Did you have to go get the watch somewhere?

A. I did. I had had it in a pawn shop in Mount

Pleasant is where I had put it.

Q. Why had you pawned it?

A. Because I didn't -- I needed it to be safe. It was a very pricey watch. I didn't know what else to do with it. I was afraid it was going to get stolen. I was afraid it was going to get lost.

Q. How much -- do you recall how much you pawned it for?

A. About $500 probably.

Q. And you immediately went and got it, carried it to the police department?

A. Yes.

Q. And that was a watch that he had made a gift of you -- to you?

A. Yeah. He knew I had the watch. He had given it to me. He had given me that right after -- it was, like, not long after I came back after I had left in January.

Q. Gayla, have you lost actual days from work due to the injuries that he has given you?

A. Yeah. I would say I have, yeah.

Q. And how many days have you lost?

A. I call in sick. I don't go in. You know, you don't sleep. You don't -- you finally go to sleep when it's time to go to work.

A. Yes.

Q. -- socially have you dated much?

A. I've went out twice with two separate people.

Q. Okay. For any extended period of time?

A. No.

Q. Is the experience that you had with Bryon affecting your ability with other people both socially and romantically?

A. Yes. In every way, yes.

Q. What -- tell me about it.

A. I don't even walk into my church anymore.

Q. Okay.

A. You know, I don't even like walking into my church. So, you know, I -- I had -- did try to date, and you're not -- you don't feel normal anymore. I did not feel normal. I don't feel normal right now. So how am I going to -- how do you relate to people? How do you feel trusting? How do you -- you know, and I've got all this playing. I mean, I play -- you know, Bryon has hit me 40-plus separate occasions. Okay. Over and over. This was a -- this was a span of it. I play those in my head daily. Pick a tape. Play it. Nobody wants to be around somebody like that.

Q. Okay.

A. I don't even want to be around me.

Q.   So, in effect, you hold yourself in low self-esteem because of this?

A.   Yes.  Absolutely.

Q.   Now, you said church.  Where have -- did you have a church that you attended on a --

A.   Yes.

Q.   -- on a regular basis in Winnsboro?

A.   Yes.

Q.   What was it?

A.   It's the Cowboy Church there in Winnsboro.

Q.   Okay.  After your protective order had been entered and he had been served with it, did he approach you at church?

A.   He did.  He started coming.  He started showing up at my church sitting in front of me.

Q.   Huh?

A.   Yeah.  He started sitting in front -- started coming to my church and sitting in front of me at my church.

Q.   Okay.  And --

A.   He followed me out.  Yes.

Q.   He followed you out and did what?

A.   He tried to talk to me.

Q.   Okay.

A.   Tried to talk to me.

A. Michael Haley worked overseas. I rarely saw him at all, ever.

Q. Isn't it true that's who you were dating?

A. Prior to Bryon?

Q. Yes, ma'am.

A. Yes, that is who I was seeing.

Q. He was living overseas, and you were over here spending his money. Correct?

A. No, ma'am.

MR. OLD: Objection. Irrelevance.

THE COURT: Hold on.

A. And I -- excuse me.

THE COURT: Ma'am, hold on just a second.

A. That's insulting.

THE COURT: Hold on just a second. All right. Overruled.

Q. Go ahead.

A. No, that is not. And I've never spent one dime of Bryon's money that Bryon didn't tell me to spend. I didn't walk to the bathroom without Bryon telling me to. You need to read up on what all Bryon is being accused of. Because I promise you, I couldn't even go to the bathroom at one point. I wasn't allowed to take showers. I wasn't allowed to walk from one room into another room. That is the man that you're defending right there that

your clothes and the stuff you had?

A. Bryon ended -- the things that I have Bryon was there when I --

Q. Isn't it also true these scars that you presented pictures of you told Bryon those were all from softball injuries you received from playing softball?

A. I've never played softball a day in my life.

Q. You never played softball?

A. Never. I can't hit a ball. I'm scared of the ball.

Q. But why did you -- when did you say Bryon gave you the Rolex?

A. That was after -- somewhere between -- it would have been somewhere between when I went back after January --

Q. Uh-huh.

A. -- and by the time that I left somewhere between February and that June, somewhere.

Q. He gave it to you or he told you to hold it?

A. No. He gave that to me.

Q. So why did you pawn it?

A. Because I didn't -- I didn't know what to do with it. I didn't know what to do with it. It's a very, very expensive watch.

Q. It's worth about $25,000. Correct?

MR. OLD:  No further questions.

THE COURT:  Thank you, ma'am.  You may step down.

We're going to take a five minute recess.

(Recess)

THE COURT:  Are y'all ready to continue?

MR. OLD:  Yes, sir.

THE COURT:  Ms. Chism?

MS. CHISM:  Yes, sir.

THE COURT:  You may call your first witness.

MR. OLD:  We would call Tim Davis.

THE COURT:  Sir, if you can come on up and have a seat, and I previously swore you in and you remain under oath.

TIM DAVIS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OLD:

Q.  Will you please state your name?

A.  Tim Davis.

Q.  And you're a doctor?

A.  Chiropractor.

Q.  Okay.  Doctor of chiropractic medicine is that -- is that accurate?

A. Doctor of chiropractic.

Q. Okay. Where do you practice?

A. Winnsboro.

Q. Are you in good standing, license to practice today?

A. I hope so.

Q. How long have you practiced?

A. Twenty years.

Q. Has most of that always been in Winnsboro?

A. Every bit of it.

Q. Are you a native of Winnsboro, Wood County --

A. Correct.

Q. -- and Franklin?

A. Uh-huh.

Q. Have you had an occasion to treat Gayla Noble?

A. Yes.

Q. When did you first treat her, Doctor?

A. I would have to look.

Q. You may look at your records?

A. It was in 2015 of May. We discussed that earlier.

Q. Okay. In May of 2015?

A. Yes.

Q. When she presented, what were her complaints?

A. I'll just read this. Neck pain, headaches,

right hip pain.

Q. Okay. And did she tell you what had caused the pain? What did she tell you?

A. She went into detail, said that she had her head slammed into the dash, causing stress whiplash, and then that she had had a prior hip issue which she feels was related to being slammed to the ground.

Q. Did she tell you who did that or --

A. I don't recall the conversation of saying who did it, but she said her spouse did it.

Q. Okay. Let me first -- and, Doctor, I apologize. You're in somewhat of a compromising situation. Are you related to anyone in the courtroom?

A. Yes.

Q. And who are you related to?

A. Bryon and Shelba Noble.

Q. Is Bryon your first cousin?

A. First cousin.

Q. Okay. And you knew he to be her spouse?

A. I didn't know at the time whether they were married or whether they wasn't married, so --

Q. Okay.

A. -- I just know that hearsay through town that they had been married, and that's all I do know. I didn't really ask -- go into a whole lot of detail.

Q.    But she reported she had received an injury from an act of violence?

A.    Correct.  Uh-huh.

Q.    Did you examine her?

A.    Yes.

Q.    Did you find any evidence of injury?

A.    Well, the evidence was clearly stated that there was bruising and a laceration on her head.

Q.    Okay.

A.    Other than the complaints that she came in with, you know, which you can't physically see neck pain but --

Q.    Can you -- did you take pictures of her that day?

A.    I did.

MR. OLD:  May I approach the witness?

THE COURT:  You may.

Q.    I'm going to show you what has been marked 14 and 15 and ask you if those are photographs you took or were taken by your office?

A.    That day.  Right.

Q.    And you saw her that day.  Do they accurately depict what they depict, what you saw?

A.    That's what I saw.

Q.    Okay.  And they were taken on May 11?

A.   Whatever date was written on there.  Which these go into electronic health record and it's stated on those records.  So it doesn't print it out on there.  That's why it was written on there.  That was our initial visit.

Q.   Okay.

A.   That day.

MS. CHISM:  That's fine.

MR. OLD:  We would offer 14 and 15, Your Honor.

(Petitioner's Exhibit No. 14 and 15, offered)

Q.   And on that day?

THE COURT:  It will be admitted.

(Petitioner's Exhibit No. 14 and 15, admitted)

Q.   After you interviewed her and took her history, what was your diagnosis?

A.   Well, it's apparent that something had happened, some type of trauma, and diagnosis was more of a sprain/strain, I believe, to the neck, and then there was an issue with her hip where she had some scar tissue built up in her right hip bursa area.

Q.   Tell me about the scar tissue.  What caused -- what --

A. Well, more than likely when we see that, which I see it regularly, it is mostly from trauma, but it's not necessary. I couldn't pinpoint that on anything, but it could have been repetitive stress or something of that nature, but that is a finding. When people have hip pain, we palpate it, and we find it.

Q. It was consistent with trauma?

A. I don't know that. It can be consistent with trauma.

Q. It can be caused by trauma?

A. Yeah, it can be. Yeah.

Q. What was your course of treatment that day?

A. That day or everyday.

Q. Well, what did you start? What did you prescribe that day? And I presume --

A. Just mainly physical and physiotherapy, which is to decrease edema and spasms and things of that nature consistent with whiplash or some type of sprain/strain.

Q. Over the -- how many times did you -- what was the last date that you saw her?

A. 6/10/2015.

Q. 6/10?

A. (Moves head up and down).

Q. And the first date was?

A. 5/11.

# TAB 3

RESPONDENT'S
EXHIBIT
R-4





RESPONDENT'S
EXHIBIT
5

PENGAD 800-631-6989

Case No.: _CN-13-15_

Applicant: _Cala Noble_                                    In the ___County___ 15 AUG 10 Court

§
§
§                                                                          of
§
§

v.

Respondent: _Kerry Bryon Noble_                              _Franklin_    CLERK County, Texas
§                                                                    FRANKLIN CO., TX.

FILED
15 AUG 10 AM 11:23
Betty Crane
COUNTY COURT
FRANKLIN CO., TX.

## Application for Protective Order

### 1 Parties

TXDL: O481926 TX
DOB: 12-27-1967

| | Name: | County of Residence: |
|---|---|---|
| Applicant: | _Cala Noble_ | _Wood_ |
| Respondent: | _Kerry Bryon Noble_ | _Franklin_ |

Respondent's address for service: _807 N. Main Winnsboro TX_    _Franklin_

*Check all that apply:*

☒ The Applicant and Respondent are or were members of the same family or household.
☐ The Applicant and Respondent are parents of the same child or children.
☒ The Applicant and Respondent used to be married. _are married livin in Separate households_
☐ The Applicant and Respondent are or were dating.
☐ The Applicant is an adult asking for protection for the Children named below from child abuse and/or family or dating violence.

### 2 Children: The Applicant is asking for protection for these Children under age 18:

DOB: 12.20.2001

| | Name | Is Respondent the biological parent? | County of Residence: |
|---|---|---|---|
| a. | _Kapler Lawrence_ | ☐ Yes ☒ No | _Wood_ |
| b. | | ☐ Yes ☐ No | |
| c. | | ☐ Yes ☐ No | |
| d. | | ☐ Yes ☐ No | |

*Check all that apply:*

☐ Other children are listed on a sheet attached to this Application.
☐ The Children are or were members of the Applicant's family or household.
☐ The Children are the subject of a court order affecting access to them or their support.

### 3 Other Adults: The Applicant is asking for protection for these Adults, who are or were members of the Applicant's family or household:

| | Name: | County of Residence: |
|---|---|---|
| a. | | |
| b. | | |

### 4 Other Court Cases: Are there other court cases, like divorce, custody, support, involving the Applicant, Respondent, or the Children?   ☒ Yes ☐ No

If "Yes," say what kind of case and if the case is active or completed.
_Assault family violence 2 cases - Interfering with 911 Call - Divorce pending_

If "completed," *(check one):*   ☐ A copy of the final order is attached.
☐ A copy of the final order will be filed before the hearing on this Application.

### 5 Grounds: Why is the Applicant asking for this Protective Order? *Check one or both:*

☒ The Respondent committed family violence and is likely to commit family violence in the future.
☐ The Respondent violated a prior Protective Order that expired, or will expire in 30 days or less. A copy of the Order is *(check one):*   ☒ Attached, or   _Copy of Police Report from Winnsboro PD & Sulphur_
☐ Not available now but will be filed before the hearing on this Application.    _Springs PD_



RESPONDENT'S EXHIBIT
10



TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Deputy BB

The Applicant requests a Protective Order and asks the Court to make all Orders marked with a check ☑️.

## 6 ☒ Orders to Prevent Family Violence

The Applicant asks the Court to order the Respondent to *(Check all that apply)*:

a. ☒ Not commit family violence against any person named on page 1 of this form.

b. ☒ Not communicate in a threatening or harassing manner with any person named on page 1 of this form.

c. ☒ Not communicate a threat through any person to any person named on page 1 of this form.

d. ☒ Not communicate or attempt to communicate in any manner with *(Check all that apply)*:

☒ Applicant ☒ Children ☐ Other Adults named on page 1 of this form.

The Respondent may communicate through: _____ or other person the Court appoints.

Good cause exists for prohibiting the Respondent's direct communications.

e. ☒ Not go within 200 yards of the *(Check all that apply)*:

☒ Applicant ☒ Children ☐ Other Adults named on page 1 of this form.

f. ☒ Not go within 200 yards of the residence, workplace or school of the *(Check all that apply)*:

☒ Applicant ☐ Other Adults named on page 1 of this form.

g. ☒ Not go within 200 yards of the Children's residence, child-care facility, or school, except as specifically authorized in a possession schedule entered by the Court.

h. ☒ Not stalk, follow or engage in conduct directed specifically to anyone named on page 1 of this form that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass them.

The Applicant also asks the Court to make these Orders *(Check all that apply)*:

i. ☐ Suspend any license to carry a concealed handgun issued to the Respondent under state law.

j. ☒ Require the Respondent to complete a battering intervention and prevention program; or if no such program is available, counseling with a social worker, family service agency, physician, psychologist, licensed therapist, or licensed professional counselor; and pay all costs for the counseling or treatment ordered.

k. ☐ Require the Respondent to follow these provisions to prevent or reduce the likelihood of family violence.

The law requires a trial court issuing a protective order to prohibit the Respondent from possessing a firearm or ammunition, unless the Respondent is a peace officer actively engaged in employment as a sworn, full-time paid employee of a state agency or political subdivision.

## 7 ☐ Property Orders

The Residence located at: _356 Wood County Road 4350 Scroggins, Tx 75480_

*(Check one)*:    ☐ is jointly owned or leased by the Applicant and Respondent;

☒ is solely owned or leased by the Applicant; or

☐ is solely owned or leased by the Respondent; and the Respondent is obligated to support the Applicant or a child in the Applicant's possession.

The Applicant also asks the Court to make these orders *(Check all that apply)*:

☐ The Applicant to have exclusive use of the Residence identified above, and the Respondent must vacate the Residence.

☐ The sheriff, constable, or chief of police shall provide a law enforcement officer to accompany the Applicant to the Residence, to inform the Respondent that the Court has ordered the Respondent excluded from the Residence, to provide protection while the Applicant takes possession of the Residence and the Respondent removes any necessary personal property, and, if the Respondent refuses to vacate the Residence, to remove the Respondent from the Residence and arrest the Respondent for violating the Court's Order.

☒ The Applicant to have exclusive use of the following property that the Applicant and Respondent jointly own or lease: _304 Carnegie Winnsboro, Tx 75494_

☒ The Respondent must not damage, transfer, encumber, or otherwise dispose of any property jointly owned or leased by the parties, except in the ordinary course of business or for reasonable and necessary living expenses, including, but not limited to, removing or disabling any vehicle owned or possessed by the Applicant or jointly owned or possessed by the parties (whether so titled or not).

Application for Protective Order                                                                 Page 2 of 4
Form Approved by the Supreme Court of Texas by order in Misc. Docket No. 05-9059 (April 12, 2005)          →


TRUE AND CORRECT COPY OF ORIGINAL.
Betty Crane, County Clerk
Franklin County, Texas
Page 2 of 3    Deputy

**8** ☐ **Spousal Support Order**

The Applicant is married to the Respondent or otherwise legally entitled to support from the Respondent and asks the Court to order the Respondent to pay support in an amount set by the Court.

**9** ☐ **Orders Related to Removal, Possession and Support of Children**

The Respondent is a parent of the following of the Applicant's children: _____

_____

And, the Applicant asks for these Orders in the best interest of the people named on page 1 of this form.
*Check all that apply:*

☐ The Respondent must not remove the children from the Applicant's possession or from their child-care facility or school, except as specifically authorized in a possession schedule entered by the Court.

☐ The Respondent must not remove the children from the jurisdiction of the Court.

☐ Establish or modify a schedule for the Respondent's possession of the Children, subject to any terms and conditions necessary for the safety of the Applicant or the Children.

☐ Require the Respondent to pay child support in an amount set by the Court.

**10** ☑ **Temporary Ex Parte Protective Order**

Based on the information in the attached Affidavit, there is a clear and present danger of family violence that will cause the Applicant, Children or Other Adults named on page 1 of this form immediate and irreparable injury, loss and damage, for which there is no adequate remedy at law. Applicant asks the Court to issue a Temporary Ex Parte Protective Order immediately without bond, notice or hearing.

**11** ☐ **Ex Parte Order: Vacate Residence Immediately**

The Applicant now lives with the Respondent at: _____ or has resided at this Residence within the 30 days prior to filing this Application. The Respondent committed family violence against a member of the household within the 30 days prior to the filing of this Application, as described in the attached Affidavit. There is a clear and present danger that the Respondent is likely to commit family violence against a member of the household. The Applicant is available for a hearing but asks the Court to issue a Temporary Ex Parte Protective Order immediately without bond, notice or hearing:

• Granting the Applicant exclusive use and possession of the Residence and ordering the Respondent to vacate the Residence immediately, and remain at least 200 yards away from the Residence pending further Order of the Court; and

• Directing the sheriff, constable, or chief of police to provide a law enforcement officer to accompany the Applicant to the Residence, to inform the Respondent that the Court has ordered the Respondent to vacate the Residence, and to provide protection while the Applicant either takes possession of the Residence or removes necessary personal property.

**12** ☑ **Keep Information Confidential**

The Applicant asks the Court to keep addresses and telephone numbers for residences, workplaces, schools, and childcare facilities confidential.

**13** ☑ **Fees And Costs**

The Applicant asks the Court to order the Respondent to pay fees for service of process, all other fees and costs of Court, and reasonable attorneys' fees, if applicable.

I have read the entire Application and it is true and correct to the best of my knowledge.

_____
Applicant, *Pro se*

Address where Applicant may be contacted: ___P.O. Box 524 Winnsboro TX 75494___

Phone # where Applicant may be contacted: ___(903)975-5727___ Fax #: _____

*(List another address/phone if you want yours kept confidential)*

TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Page 3 of 31

# Affidavit

County of _Franklin_

State of Texas

My name is _Gala Noble_. I am _47_ years old and otherwise competent to make this Affidavit. The information and events described in this Affidavit are true and correct.

1  Describe the most recent time the Respondent hurt you or threatened to hurt you:

_See attached_

2  What date did this happen? _June_ / _1_ / _2015_

3  Was a weapon involved?  ☑ Yes  ☒ No  If yes, what kind? _____

4  Were any children there?  ☐ Yes  ☒ No  If yes, who? _____

5  Did you call the police?  ☒ Yes  ☐ No  If yes, what happened? _____

6  Did you get medical care?  ☐ Yes  ☒ No  If yes, describe your injuries: _____

7  Has the Respondent ever threatened or hurt you *before*? Describe below, including date(s).

_Yes - See Attached_

8  Were weapons ever involved?  ☒ Yes  ☐ No  If yes, what kind? _See Attached_

9  Were any children there?  ☐ Yes  ☒ No  If yes, who? _____

10  Have the police ever been called?  ☒ Yes  ☐ No

11  Did you ever have to get medical care?  ☐ Yes  ☒ No  If yes, describe your injuries:

_Needed medical care - but he refused to allow me to go - San Chiropractor in May & learn bm - back & neck issues from multiple times being hit on this car_

Applicant signs here _Noble_

On _8_/_10_/_15_, the Applicant _Gala Noble_ personally appeared before me, the undersigned notary. After being sworn, the Applicant stated that she/he is qualified to make this oath, that she/he has read the foregoing Application and Affidavit, that she/he has personal knowledge of the facts asserted, and the facts asserted are true to the best of her/his knowledge and belief.

Subscribed and sworn to before me on _8_/_10_/_15_.

MISTY D. MARTIN
NOTARY PUBLIC
STATE OF TEXAS
Commission Expires: 07-11-2016

_Misty D Martin_
Notary Public in and for the State of Texas
My Commission expires: _July 16th 2016_

Application for Protective Order
Form Approved by the Supreme Court of Texas by order in Misc. Docket No. 05-9059 (April 12, 2005)

Page 4 of 4


TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Page 4 of 37  Deputy BB

①

Has hit me in the head multiple time
Poured hot Coffee on me
Poured cold water on me
Choked me multiple times
Slammed my head into walls multiple times
Slammed head on tile & hardwood floors
Whipped across back & head with extension cord
thrown objects at me
hit me with long solid door stopper/jam
dragged me out of bed by my hair while sleeping
hit me in the face with metal picture
    Causing cut between my eyes - causing scar
I have multiple scars on (R) arm & bilateral
    legs from being thrown into cabinets, walls,
    skidding across floor, garage, yard, etc.
locked me in house without use of phone
many many times - would not allow
me to call for help - couldn't call my
children; often not allowed to call or
talk to anyone -
would take air out of tires so I couldn't drive
took my purse and wouldn't let me have my
    drivers license, Social Security card, bank
    card + would take any cash I had
Wouldn't let me get a job - would work
for him while he was with me yet


TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Page 5.37 Deputy



told me daily I am good for nothing
Since I didn't bring a paycheck into the house -
I was only good for sex

Daily verbal abuse - rarely let me cook,
Clean, work in yard - He would make
me sit beside him or be in bed beside
him -

He hit me multiple times a week
Hid keys from me to the car
Wouldn't allow me to answer the door
if some knocked

threw away or gave away alot of
my clothes and personal things

Would watch me use the restroom
to humiliate me.

Watched me shower when angry and
timed me - would say he would drag
me out if I was taking too long

Wouldn't let me lock bathroom door

He offered my sexual services on Craigslist

Told me many times I would not leave the
room alive today

Told me several times my family should
have killed me

Told me if I left him - he would kill
me or himself

TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Page 6 of 37 Deputy BB

(3)

Told me regularly everyone hates me - his family, my family, neighbors and friends

Daily accused me of multiple affairs

Would shove scarves and clothes down my throat if I cried until he said I couldn't breathe then

Would pull them out if I cried still - would put them back til I stopped crying -

Would hold me down with arms or hands twisted - many time he only stopped because he said he thought he broke a bone & didn't want anyone to find out

I was tortured on my (R) upper thigh so many times it has built up scar tissue and won't heal -

He refused on many occasions to allow me to get medical care for injuries

Refuse me routine appts. with doctor because I would be bruised and didn't want Doctor to see

Has slammed my face into dash of car causing Black eye

TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas
Page ___ of ___ Deputy ___

Always threatening to call CPS on
me if I didn't do the things he
told me to do

Would get on websites and talk
to people he knows - in front of me
trying to get them to have sex
with me

Told me he had been putting meth
in my Coffee and had his friend
do a hair follicle sample and I
had a positive test and that if
I didn't do the things he wanted would
call CPS to have my daughter taken
from me

He has been very threatening, Controlling
always intimidating me with threats
of abuse -

We have been kicked out of Adolphus
Hotel in Dallas because of him
beating me and I refused to file report -
man in next room heard me being hit
and begged me not to leave hotel with Bryan.
He would give me my phone and have
me text for sexual services while he
was beside me - Has kicked me out
of our car at night in the Country to make


TRUE AND CORRECT COPY OF ORIGINAL
Becky Crane, County Clerk
Franklin County, Texas

(5)

me walk - I walked to a house and called police - they didn't come in 45 minutes so I called someone to come and get me.

He had multiple affairs that he has admitted and given them my personal belongings.

And my daughters personal belongings.

Beat me, sexually assaulted me, telling me GOD won't listen to me because I have an unforgiving heart.

Would make me listen to him have phone sex with men ~~and~~. Would daily talk about GOD and how he would improve our lives if I would just be more faithful to GOD & help him more - Be a better wife -

He recently filed a false claim with police and Insurance Company over supposed stolen property - later telling me what he had done and wanting me to go along in the story - I have refused and am concerned very much about him retaliating against me.

He has threatened my adult children and at this time has 2 Assault family violence charges against him in relation to me -

Calardahle

TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
____ County, Texas
Page 9 of 37

# Respondent Information

Fill out this form then file it with the clerk. Law enforcement needs this information to serve the Respondent and enter it into the state database for protective orders.

Respondent's Name: _Kerry Bryan Noble_

Alias (Nickname): _____

Respondent's relationship to Applicant: _Husband_

Respondent lives in: _Franklin_ County

Street: _803 N. Main_    City: _Winnsbro_    State: _TX_    Zip: _75494_

Sex ☒M ☐F    DoB _12 / 6 / 1967_    DL # _12590848_

Height ___ ft ___ in    Place of birth _____    Other ID# _____

Weight ___ lbs    SS # _____    State ___    Expires _____

| Race | Eye color | Hair color | Skin |
|---|---|---|---|
| ☐ American Indian or Alaskan Native (I) | ☐ Black (BLK) | ☐ Black (BLK) | ☐ Albino (ALB) |
| ☐ Asian Pacific Islander (A) | ☐ Blue (BLU) | ☐ Blond or Strawberry (BLN) | ☐ Black (BLK) |
| ☐ Black (B) | ☒ Brown (BRO) | ☐ Brown (BRO) | ☐ Dark (DRK) |
| ☒ White (W) | ☐ Gray (GRY) | ☒ Gray or partially gray (GRY) | ☐ Dark Brown (DBR) |
| ☐ Unknown (All other non-whites) (U) | ☐ Green (GRN) | ☐ Red or Auburn (RED) | ☐ Fair (FAR) |
| | ☐ Hazel (HAZ) | ☐ White (WHI) | ☐ Light (LGT) |
| Other: | ☐ Maroon (MAR) | ☐ Sandy (SDY) | ☐ Light Brown (LBR) |
| | ☐ Pink (PNK) | ☐ Completely Bald or Unknown (XXX) | ☐ Medium (MED) |
| _____ | ☐ Multicolored (MUL) | | ☐ Medium Brown (MBR) |
| **Ethnicity** | ☐ Unknown (XXX) | | ☒ Olive (OLV) |
| | Other: _____ | Other (style/length): _____ | ☐ Ruddy (RUD) |
| ☐ Hispanic (H) | | | ☐ Sallow (SAL) |
| ☐ Non-Hispanic (N) | | | ☐ Yellow (YEL) |
| ☐ Unknown (U) | | | ☐ Unknown (XXX) |
| | | | Other: |

---

*You do not have to fill out the rest of this form. But, it may help law enforcement serve the Respondent.*

Other Identifying Information *Check all that apply*

☐ Glasses    Unusual markings on body *(describe)*    ☐ Mental Problems _____

☐ Beard    ☐ Tattoos _____

☐ Moustache    ☐ Scars _____    ☒ Drug/Alcohol Problems _Meth_

☐ Missing front teeth    ☐ Markings _____    ☐ Weapons _____

☐ Bald    ☐ Piercings _____

Respondent works at *(name of business)*: _____

Street: _____    City: _____    State: _____    Zip: _____

Phone: _____    Hours/Dept: _____    Supervisor: _____

Respondent's Vehicle: VIN _____    Color: ____    Year: ____    Make/Model: _____

License Plate #_____    State: _____    Exp. _____

Respondent's Attorney *(Name)*: _____

Phone: _____    Address: _____

Other contacts who may have information to help find Respondent:

Name: _____    Phone: _____

Address: _____    Relationship: _____

Other Information: _____

Name: _____    Phone: _____

Address: _____    Relationship: _____

Other Information: _____

Respondent Information


TRUE AND CORRECT COPY OF ORIGINAL
Betty Crane, County Clerk
Franklin County, Texas



Gayla Noble— 5-11-15
DoB — 12-27-67

Printed— 2-29-16
C Beaver

RESPONDENT'S EXHIBIT
14

Gayla Noble – 5-11-15
DOB – 12-27-67

Printed – 2-29-16
CBeaure

RESPONDENT'S
EXHIBIT
15